716 P.2d 513

**D.J. NELSON, Plaintiff-Respondent-Cross Appellant,**

and

**D.J. Nelson and Donna Nelson, husband and wife, Plaintiffs,**

v.

**WORLD WIDE LEASE, INC., Defendant-Appellant-Cross Respondent,**

and

**ABC Corporation, and John Does I through X, Defendants.**

**No. 14999.**

Court of Appeals of Idaho.

Feb. 21, 1986.

Rehearing Denied April 29, 1986.

James C. Tucker, of Nelson, Rosholt, Robertson, Tolman & Tucker, Twin Falls, for defendant-appellant-cross respondent.

Kenneth L. Pedersen, of Webb, Burton, Carlson, Pedersen & Paine, Twin Falls, for plaintiff-respondent-cross appellant.

SWANSTROM, Judge.

D.J. Nelson, a farmer, sued World Wide Lease, Inc., for damages after it repossessed two center pivot irrigation systems ("pivots") that Nelson was leasing. Nelson alleged that World Wide had converted one pivot being leased by Nelson from another company, and had also breached its own lease agreement with Nelson when it took the other pivot. World Wide counterclaimed, alleging Nelson had breached the lease by defaulting in payments. At trial the jury returned a special verdict finding that World Wide had converted a pivot in which World Wide had no interest. The jury awarded Nelson damages resulting from that conversion. However, the jury also found that World Wide had not breached its lease agreement with Nelson by repossessing either pivot. The jury awarded World Wide damages on its counterclaim against Nelson for a deficiency owing under the lease. World Wide has appealed from the net judgment entered against it.

World Wide raises four issues on appeal: (1) whether the trial court had personal jurisdiction over World Wide; (2) whether there was sufficient evidence to establish that the person who actually repossessed the pivots was acting as an agent of World Wide; (3) whether the district court erred in admitting testimony which World Wide contends is hearsay; and (4) whether the lost profits due to the conversion were established by Nelson at trial with reasonable certainty. Nelson has cross-appealed, raising an additional issue of whether the district court erred in failing to instruct on punitive damages. Finally, Nelson requests attorney fees on appeal. For the reasons discussed below, we vacate the judgment and remand for a new trial.

The dispute concerns a development project created by Desert Valley Farms, Inc., on lands owned by Southern Pacific Railroad Company near Winnemucca, Nevada. Nelson, through negotiations with Emery Wiser, a principal in Wiser Irrigation and in Desert Valley Farms, Inc., entered into an oral sublease arrangement with Desert Valley Farms, Inc., and in 1975 began to farm two quarter sections of desert land. Other farmers commenced leasing adjacent parcels about the same time. Wiser Irrigation developed the irrigation systems for Nelson. They consisted of a separate well, sprinkler pivot, pump, engine and controls for each quarter section. World Wide purchased one of those pivot systems and leased it to Nelson. NBC Leasing Co. purchased and leased the second pivot system to Nelson.

Nelson grew crops of potatoes or grain in each of the years 1975 through 1979. Nelson testified that his landlord was supposed to allow him to switch his farming onto different tracts in 1980 but would not do so; and that without the "rotation" his banker would not finance his farming operation for 1980. As a result he did not plant any crop in the Desert Valley project in 1980. In June 1980 he failed to make a semi-annual lease payment on the irrigation equipment leased from World Wide. The leasing company made some unsuccessful attempts to contact Nelson who received, but did not respond to, payment notices sent to his address. In the late fall of 1980, World Wide sent Davis Chausse to Nevada to locate the pivot it had leased to Nelson and also an identical pivot it had leased to a Mr. Butler, another farmer in the project. After receiving Chausse's report, World Wide authorized Chausse to repossess Butler's pivot and Nelson's pivot. Chausse did repossess two pivots, one of which was the pivot leased by World Wide to Nelson. However, after the repossession, Nelson contacted World Wide with the information that the second pivot it had repossessed was the one which Nelson had leased from NBC Leasing Co. World Wide contended that it had repossessed the correct pivots. This lawsuit followed.

## JURISDICTION OF THE TRIAL COURT

■ We first consider World Wide's contention that the district court lacked personal jurisdiction over World Wide, a Washington corporation. The district court held that objection to the court's jurisdiction was waived by World Wide's appearance in court and filing of a counterclaim. Rule 12(b), I.R.C.P., states in relevant part: "No defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion." The relevant portion of the rule is identical to the federal rule and is considered to have abolished the distinction between special and general appearances. *Orange Theatre Corporation v. Rayherstz Amusement Corporation*, 139 F.2d 871 (3d Cir.1944), *cert. denied* 322 U.S. 740, 64 S.Ct. 1057, 88 L.Ed. 1573 (1944). Rule 12 requires that the defense of lack of jurisdiction over the person be raised either by a pre-answer motion or in the answer itself no later than the raising of other defenses under the rule. *Wright v. Yackley*, 459 F.2d 287 (9th Cir.1972). The record establishes that World Wide raised the objection to jurisdiction in its answer. Therefore, the objection was properly and timely raised.

The next question is whether the counterclaim filed with the answer, seeking a judgment against Nelson for the deficiency due under the lease contract, constitutes a waiver of jurisdiction. A counterclaim is compulsory "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." I.R.C.P. 13(a). The counterclaim in this case is compulsory, because it arose out of the lease transaction which is the subject matter of a portion of Nelson's complaint. The preferred rule is that a compulsory counterclaim does not waive jurisdictional defenses. 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1397 (1969). *See also Dragor Shipping Corporation v. Union Tank Car Company,* 378 F.2d 241 (9th Cir.1967); ANNOT., 17 A.L.R. FED. 388 (1973). We hold that World Wide did not waive its jurisdictional objection by filing a compulsory counterclaim.

We now turn to World Wide's contention that Idaho does not have jurisdiction because Nelson's cause of action did not arise out of World Wide's minimum contacts with Idaho. World Wide bases this argument on the facts that it is a Washington corporation authorized to do business in Idaho, Nelson is a resident of Oregon and the conversion occurred in Nevada. World Wide also notes, correctly, there is no finding or clear proof in the record that the lease agreement between World Wide and Nelson was entered into in the State of Idaho. World Wide has cited various cases stating that a cause of action must arise out of minimum contacts occurring within the state. *E.g., Intermountain Business Forms, Inc. v. Shepard Business Forms Co.,* 96 Idaho 538, 531 P.2d 1183 (1975); *B.B.P. Association, Inc. v. Cessna Aircraft Co.,* 91 Idaho 259, 420 P.2d 134 (1966). These cases are not dispositive, as they set forth the standard for application of the long-arm statute, I.C. § 5–514. They do not establish the standards for application of the theory asserted by Nelson that World Wide cannot contest jurisdiction when it has become authorized to do business in Idaho, has actively engaged in the business of leasing personal property in this state and has appointed a resident agent upon whom process was served.

States often impose conditions upon foreign corporations seeking authorization to operate within the state. Idaho requires that the corporation maintain a registered office within the state and designate an agent within the state to receive process. I.C. § 30–1–113. "The registered agent so appointed by a foreign corporation authorized to transact business in this state shall be an agent of such corporation upon whom any process, notice or demand required or permitted by law to be served upon the corporation may be served." I.C. § 30–1–115. This statute does not expressly limit consent to jurisdiction to those causes of action arising only from corporate activities within the state. States with statutes similar to Idaho's have reached varying conclusions on whether jurisdiction provided by these statutes extends to any cause of action or only to those associated with the corporation's activity in the state. *See* CASAD, R., JURISDICTION IN CIVIL ACTIONS 3.02[2] (1983).

World Wide argues that jurisdiction acquired upon a foreign corporation by service of process upon a registered agent under I.C. § 30–1–115, ought to be limited only to those cases where the corporation's activities in Idaho give rise to the suit. *See Budde v. Ling-Temco-Vought, Inc.,* 511 F.2d 1033 (10th Cir.1975). However, such a limitation has not been adopted by the Legislature or by any decision of this state. Other states in considering the effect and purpose of similar statutes compelling an authorized corporation to designate an instate agent for service of process have refused to adopt such a restrictive view. *See Cowan v. Ford Motor Company,* 694 F.2d 104 (5th Cir.1982); *Junction Bit & Tool Co. v. Institutional Mortgage Co.,* 240 So.2d 879 (Fla.App.1970); *Goldman v. Pre-fab Transit Company,* 520 S.W.2d 597 (Tex.App.1975). The rationale for claiming

jurisdiction is that "in return for the privilege of doing business in the state, and enjoying the same rights and privileges as a domestic corporation, [cite omitted] the foreign corporation has consented to amenability to jurisdiction for purposes of all lawsuits within the state." *Goldman v. Pre-fab Transit Company,* 520 S.W.2d at 598. Further, it is said that when a corporation appoints a resident agent and conducts business in a state, it has agreed to be treated as a resident corporation. It has been held that authorized foreign corporations and domestic corporations should be treated equivalently. *Cowan v. Ford Motor Company, supra.*

Other jurisdictions have held that service of process upon a resident agent appointed by a foreign corporation will subject the corporation to the state court's jurisdiction, if it is further "shown that the corporation has sufficient contact with the State to make it constitutionally subject to suit [in that state]." *Springle v. Cottrell Engineering Corporation,* 391 A.2d 456, 469 (Md.App.1978). *Accord In Re Mid-Atlantic Toyota Anti-trust Litigation,* 525 F.Supp. 1265 (D.Md.1981), *modified on other grounds,* 541 F.Supp. 62 (D.Md. 1981). Maryland has chosen to read its statute regarding service of process upon a resident agent of foreign corporations and its statute establishing long-arm jurisdiction together. The result is that jurisdiction is established when a valid service of process is effected upon a foreign corporation's resident agent and at least one of the jurisdictional criteria set forth in the long-arm statute is present. Under these circumstances, the minimum contact that would confer jurisdiction under the long-arm statute does not have to be the activity that gives rise to plaintiff's cause of action.

The conclusions and rationale of the courts in *Cowan, supra,* and *Junction Bit & Tool Co., supra,* and *Goldman, supra,* are persuasive. They would support a ruling that Idaho courts have jurisdiction over nonresident corporations authorized to do business in Idaho and actually engaged in business in Idaho when valid process has been served upon their resident agents,

regardless of whether the cause of action against the corporation arose out of its activities in Idaho. However, we recognize that such a holding might raise a due process problem if jurisdiction is held to extend to causes of action totally unrelated to the state and to claims by persons having no connection with the state. Therefore, we deem it proper to consider the foreign corporation's contacts with Idaho to determine whether it is reasonable to subject the corporation to jurisdiction in Idaho. *Springle, supra, In re Mid-Atlantic, supra.*

■ World Wide cites several cases to support the view that Idaho's exercise of jurisdiction in this case would violate due process. *Morris & Co. v. Scandinavia Insurance Co.,* 279 U.S. 405, 49 S.Ct. 360, 73 L.Ed. 762 (1929); *L. & N.R. Co. v. Chatters,* 279 U.S. 320, 49 S.Ct. 329, 73 L.Ed. 711 (1929). In these two cases, the United States Supreme Court appeared to prefer a construction of foreign corporation process statutes to exclude those causes of action which do not arise out of business done by the corporation in the state. However, it is significant to note that in *Morris* the corporation was not conducting business in the forum state, but was merely licensed to do business there. In addition, the court left to the states the interpretation of the reach of their own statutes. In *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), the Court decided that due process does not require that the cause of action against a foreign corporation arise out of the corporation's activities in the state where the action is brought.

Here the record indicates that since 1975 World Wide has been actively engaged in leasing property in the State of Idaho. Therefore, World Wide not only applied for the privilege to do business in Idaho it actually exercised that privilege. The requirements of having "minimum contacts" with this state have been met. Further, the cause of action relates to a similar leasing transaction. We hold that Idaho's exercise of jurisdiction in this case is not

offensive to due process. *Compare Ratliff v. Cooper Laboratories, Inc.,* 444 F.2d 745 (4th Cir.1971), *cert. denied* 404 U.S. 948, 92 S.Ct. 271, 30 L.Ed.2d 265 (1971) (where court held corporation's activities were not extensive enough to warrant jurisdiction, noting element of forum shopping was present).

World Wide further argues that the purpose of Idaho establishing jurisdiction over a foreign corporation is to provide a forum for Idaho residents. Accordingly, World Wide asserts that Nelson, a resident of Oregon, should be denied Idaho jurisdiction. We agree that when neither party is a resident of Idaho, other contacts with the state should be carefully examined. Here, not only had World Wide actively done business in Idaho but Nelson also testified that his residence was in Oregon "on the boundary line" near Homedale, Idaho. We conclude that the district court properly refused to dismiss the suit for lack of jurisdiction.[1]

## LIABILITY FOR ACTS OF AGENT

■ We next examine World Wide's contention that the evidence produced at trial does not support the jury's finding that Chausse was acting as World Wide's "agent" in the repossession of the pivots. World Wide asserted at trial that Chausse was acting as an independent contractor. The burden of proving agency is upon the party who asserts it. *Transamerica Leasing Corp. v. Van's Realty Co.,* 91 Idaho 510, 427 P.2d 284 (1967). The creation of an agency relationship arises from the consent by one to another that the other shall act on his behalf and subject to his control. *Thornton v. Budge,* 74 Idaho 103, 257 P.2d 238 (1953). Authority of an agent to act for a principal does not have to be established by direct or positive proof but may be inferred from dealings, circumstances, acts and conduct. *Commercial Insurance Co. v. Hartwell Excavating Co.,* 89 Idaho 531, 407 P.2d 312 (1965). The general test

which establishes a relationship of employee and servant as opposed to an independent contractor is "the right to control and direct the activities of the employee, or the power to control the details of the work to be performed...." *Pinson v. Minidoka Highway District,* 61 Idaho 731, 737, 106 P.2d 1020, 1022 (1940). In contrast, an independent contractor is subject to control only as to the result or product of the work. The existence of agency relationship is a question for the trier of fact to resolve from the evidence. *Clark v. Gneiting,* 95 Idaho 10, 501 P.2d 278 (1972).

The facts are undisputed that Tal Kennedy, head of the department in control of delinquent accounts of World Wide, had the authority to decide when to repossess equipment. Kennedy first requested Chausse to go to Desert Valley and report back to him. On this first trip to Nevada, Chausse was not authorized to take possession of the pivots, but was to observe the equipment and report back to Kennedy. Kennedy admitted that his decision to repossess the pivots was based partially on Chausse's report. Chausse testified that prior to the taking of the pivots he kept in close contact with Kennedy. Further, Kennedy provided Chausse with the information concerning which pivots to take and which pivots to leave behind. The record in this case indicates that World Wide engaged in the selection of which equipment to take, and monitored the method of determining which equipment to take. However, Chausse provided his own equipment and established his own method of removing the pivots.

Admittedly, some facts indicate that Chausse was an independent contractor while others tend to establish he was an agent. The jury, after weighing the evidence, found that Chausse was acting as World Wide's agent when he repossessed the pivots. An examination of the record indicates that there is substantial, though conflicting, evidence to support the jury's

---

**1.** Even if jurisdiction exists and may be exercised constitutionally, a court might entertain a motion to decline jurisdiction in favor of another, more convenient forum. However, no motion challenging Idaho as a forum non conveniens was filed in this case.

finding upon this point and, therefore, we will not disturb that finding. *Bentzinger v. McMurtrey,* 100 Idaho 273, 596 P.2d 785 (1979).

## EVIDENTIARY RULINGS ON DAMAGES

### A

■ As we have noted, Nelson farmed two quarter sections under an oral lease with Desert Valley Farms or with its successor-in-interest, Kaye Dick, between 1975 and 1979. A highly disputed issue at trial was whether Nelson had any right to continue farming after 1980 and therefore to claim any loss of profits for the years 1981 and 1982.

Nelson asserted that but for the repossessions he would have resumed his farming of the same two quarter sections in 1981 and 1982. He testified that no legal action had been taken by his landlord to dispossess him as of the time of trial in January 1983. He testified that although he did not live on the project after 1979, he still had some personal property located on the site at the time of trial. In 1980 Nelson attempted, unsuccessfully, to get written commitments from the owners of the project which would permit him to grow potatoes on two quarter sections of "rotation" ground instead of the two quarter sections he had previously farmed. He indicated his banker would not finance his future farming operation without a *written* lease giving him the right to rotate a potato crop onto other suitable land in 1981. Nelson nevertheless testified that he had no disputes with his then landlord, Mr. Dick, about his right to be on the property. During cross-examination of Nelson, World Wide introduced a letter from Mrs. Kaye Dick to Nelson and one from the Dicks' attorney showing that Nelson would not be permitted to farm in the project in 1981. The only objection made to these exhibits was on the grounds of relevancy. Thus there was evidence that Nelson would be unable to finance his farming operation again in 1981 and that his purported landlord would not allow him to farm.

To counter this adverse evidence, on redirect examination Nelson's attorney asked Nelson about a conversation Nelson said that he had with Kaye Dick after receipt of the two mentioned letters. World Wide's attorney objected to the proffered testimony on the grounds that Kaye Dick's out-of-court statements would be hearsay. The following exchange then occurred in the jury's presence:

MR. PEDERSEN: We are not offering it for the truth of it—just the fact he had said it regarding Joe Nelson's right to farm it.

THE COURT: What was Mr. Dick's position at this particular time?

MR. PEDERSEN: I think he was a successor in interest to Desert Valley Farms, the landlord.

THE COURT: Well, I think that he therefore becomes at least an agent; and his statements are an exception to the hearsay rule. The objection is overruled.

MR. TUCKER: If Your Honor please, he is not our agent, though, certainly.

THE COURT: Well, the objection is overruled.

MR. TUCKER: Thank you, Your Honor.

Q. (By Mr. Pedersen) Joe, what did he tell you about Section 19?

A. He said I could—no problem with me farming where I had been farming.

The hearsay rule excludes the evidence of out-of-court statements only when the statements are offered to prove the truth of the matter asserted by the out-of-court declarant. *Frank v. City of Caldwell,* 99 Idaho 498, 584 P.2d 643 (1978). It is obvious that Nelson was attempting to show, through introduction of Dick's statement, that Nelson did have Dick's permission to keep farming the two quarter sections he had previously farmed. We are not persuaded by Nelson's arguments that the statement was offered for another purpose. Even Nelson's brief seems to concede its purpose was "to establish that Joe Nelson was not a trespasser and that he would have been able to farm in 1981 and 1982."

By the introduction of this hearsay testimony World Wide was denied the opportunity to cross-examine the purported declarant, Kaye Dick. Nelson's testimony to the effect that Dick had said there would be "no problem" with Nelson continuing to farm the east half of section 19 after 1980 was the only evidence which contradicted World Wide's proof that the owners and lessees of the property would not have allowed Nelson to farm. Because the evidence on this vital point was in direct conflict, the error of admitting this hearsay testimony cannot be said to be without prejudice. *See, e.g., Groener v. Briehl,* 135 Ariz. 395, 661 P.2d 659 (Ariz.App.1983); *Anderson v. Hagen,* 19 Cal.App.2d 714, 66 P.2d 168 (1937); *St. Louis-San Francisco Railway Co. v. Powell,* 385 P.2d 465 (Okla. 1963).

B

■ World Wide also asserts that the trial court erred in a related evidentiary issue involving Nelson's proof of entitlement to damages. On the first day of trial Nelson offered into evidence a copy of a lease agreement which purportedly embodied the terms of his lease of the two quarter sections.

Mr. Tucker: If the court please, we are going to object. Number one, this appears to be a photocopy of an original document with various items written in pencil, it looks like, on this photocopy that perhaps previously were blank. It is not a signed document. And in fact it does not even contain Mr. Nelson's name on it even though it purports to be a lease agreement for ten years; and it is signed by no one. We are going to object on the basis that we think it violates the statute of frauds; and it is not admissible."

After some discussion and additional objections by counsel for World Wide the court reached an erroneous conclusion with regard to the significance of the lease agreement, particularly with regard to the issue of lost future profits:

The Court: Well, Mr. Tucker, I am sure that if the question in this case were a question of the validity of that lease and if the issues in this case were between a lessor and a lessee on that lease, your objection is well taken. However, that's not the issue in this case at all. And the fact that Mr. Nelson did occupy that land and while doing so contracted with your company to buy or to lease from you a pivot is the important issue. *Whether or not he was validly on that land has no bearing on the issues in this case at all.* [Emphasis added.]

Therefore for whatever it is worth the objection is overruled. Exhibit 2 will be admitted mostly to show that that is the land which Mr. Nelson was occupying under his claim of right.

During the course of the trial it became obvious that whether Nelson had the right to farm the property in 1981 or 1982 was an important issue in the case. Establishment of this right was foundational to Nelson's claim for lost profits for these two years. It was an issue on which Nelson had the burden of persuasion. World Wide asserts that the trial court's statement underlined above was an erroneous conclusion. We agree. By allowing the written document to be admitted, the court in effect permitted Nelson to prove the terms of an oral lease merely by introducing a copy of a purported lease agreement between other parties regarding different tracts from the ones Nelson had farmed.

C

The final evidentiary ruling which World Wide argues was erroneous was the admission into evidence of a copy of a complaint in a pending action brought by a third party against Nelson. The complaint was offered by Nelson to prove "consequential damages that resulted from the wrongful conversion" of the NBC pivot by World Wide. Before discussing the district court's ruling to admit this evidence, we will first mention certain jury instructions which are implicated in this issue. We feel that there is a need to do this because of

problems that could arise again after remand of the case.

The jury was instructed that if it found World Wide wrongfully converted the NBC pivot, it could award certain items of damages including the market value of the pivot at the time it was taken by World Wide. The jury was also instructed that damages could be awarded for any profits lost as a result of the conversion. The verdict, unfortunately, did not provide spaces for the separate items of damages. Therefore, we cannot uphold any part of the judgment for damages because we have no way of knowing which items of damage were supported by admissible evidence and which items were not so supported. For example, Nelson's evidence as to the value of the NBC pivot was not clear nor was it undisputed. Nelson produced evidence only of what the equipment cost when it was installed on the project five and one-half years before the conversion occurred. The figure included the cost of certain equipment that was not repossessed and also the cost of installation. The judge instructed the jury that "[t]he price received for the pivot system when it was sold,[2] while not conclusive, is competent evidence of the value of the pivot system." Nelson testified that the original engine used to operate the pump was well-worn, but he also testified that the pivot system was in good operating condition when it was repossessed by World Wide. World Wide's evidence was that the equipment, when repossessed, was broken, was not operable and had apparently been "cannibalized" for some parts. The only proof offered by World Wife as to value was in the nature of offers it had received for the dismantled equipment after it had been trucked to Oregon.

The jury was also instructed that it could award damages for

   1. The reasonable value of the use of the property taken and detained while World Wide continued to detain it from the Nelsons; and

   2. The Nelsons' expenses and damages reasonably incurred incidental to World Wide's taking and detention of the property and the Nelsons' attempts to recover it.

The above instruction was duplicated in part by instruction No. 28. As the parties are well aware, this instruction proved to be a very confusing one for the jury. We have read instruction no. 28, in conjunction with the other instructions given, and we also find it to be confusing. On retrial the damage instructions should be rewritten to avoid duplication and to avoid the language found confusing by the jury.

■ While no error was assigned to the giving of these instructions, nor has their correctness been challenged, they nevertheless might have increased the probability of prejudice to World Wide from the evidentiary ruling made by the trial court early in the trial. The complaint Nelson offered into evidence was filed against him in January 1982 by a successor of NBC Leasing Co. The complaint alleged that the Nelsons had defaulted on their irrigation equipment lease with NBC and it asked for return of the equipment or payment of the balance of $51,300 due plus $7,500 attorney fees from the Nelsons.

World Wide objected to the relevancy of the complaint. Nelson's counsel responded:

Well, it is intended to prove resulting consequential damages that resulted from the wrongful conversion of the property. They got sued for this amount. It is a claim against them. I think it is entirely relevant to prove that they did in fact get sued.

The court overruled World Wide's objection and admitted the exhibit. World Wide alleges that admission of this evidence was prejudicial error. We agree. First, the allegation in the complaint that Nelson

---

**2.** Presumably, this means when the equipment was acquired by NBC Leasing Co. for purposes of leasing it to Nelson.

owed $51,300 on the NBC lease is not competent proof that $51,300 or any other amount was owing on the equipment when it was repossessed. Secondly, the amount that Nelson still owed on the equipment when World Wide "repossessed" is not itself an item of damage. What Nelson owed would be the same whether the equipment was repossessed or not. Moreover, it has no relevancy as to the market value of the equipment when repossessed, nor as to any other allowable item of damages. Thirdly, for the same reasons, the prayer in the complaint for $7,500 attorney fees was incompetent evidence. Because the jury could have believed from this exhibit that the Nelson had become obligated to pay $7,500 attorney fees due to the conversion of the equipment by World Wide, the error in admitting the complaint "to prove resulting consequential damages" is prejudicial. As we have noted earlier, there is no way to tell from the jury verdict what items may have made up the jury's award of damages.

## SUBSTANTIVE ISSUES ON DAMAGES

### A

World Wide finally argues that the jury's award of damages for lost profits for the years 1981 and 1982 was unsupported by the evidence. While the amount of damages found by the jury for lost profits is unknown, Nelson's evidence of profits lost from the one quarter section irrigated by the NBC pivot amounted to a total of about $58,400 for 1981 and 1982. We will assume, therefore, that the jury may have awarded up to this amount. We will examine this issue even though the case is being remanded on other grounds, because the issue is apt to arise again on a retrial. The plaintiff's proof of lost profits would likely be the same. Perhaps our ruling here will enable the parties to narrow the issues to be tried on remand.

The requirements for recovery of lost profits are first, that the damages be proved with reasonable certainty and second, that they were within the contemplation of the parties. *Lamb v. Robinson*, 101

Idaho 703, 620 P.2d 276 (1980). The first requirement, that lost profits be proven with reasonable certainty, is contested in this case. The test for reasonable certainty has been held to be a requirement that the damages be taken out of the realm of speculation. *Lamb v. Robinson, supra.* It does not demand proof with mathematical exactitude. *Galindo v. Hibbard,* 106 Idaho 302, 678 P.2d 94 (Ct.App.1984).

World Wide's claim that damages are too uncertain is based on several facts. First, in 1980, Nelson did not farm due to crop rotation requirements, land lease problems and resulting lack of financing. Second, during 1975 to 1979, Nelson could not calculate his profits for the Desert Farm area because he combined it with his Idaho ranch profits. Finally, his crop yields in 1977 and 1979 were reduced due to fertilizer or seed problems. However, the relevant question is not whether Nelson has an established earning record but whether he has proven the damages for lost profits with reasonable certainty. *Galindo v. Hibbard, supra.*

There was evidence at trial from which the jury could have inferred that Nelson was capable of earning a profit during 1981 and 1982. Nelson testified extensively at trial regarding the lost crop value. He outlined the expenses which would have been incurred for fertilizer, seed, fuel, labor, harvesting and marketing expenses. Nelson further testified as to his farming plans for the relevant years. He testified to his expected crop yield and the market price during those years.

Nelson was competent to testify on these matters. He has been farming for thirty years. He testified he was aware of the market price through his experience in farming. The credibility of a witness, and the inferences to be drawn from the evidence, are determinations to be made by the jury. We hold that the testimony was sufficient to take damages out of the realm of speculation and to satisfy the requirement of reasonable certainty. *See Eliopu-*

*los v. Kondo Farms Inc.,* 102 Idaho 915, 643 P.2d 1085 (Ct.App.1982).

## B

Next, World Wide contends that Nelson is not entitled to any damages for the conversion of the pivot which Nelson leased from NBC. World Wide argues that Nelson was in default on the NBC lease, therefore, NBC could have repossessed its pivot. Had NBC done this, Nelson would be in the same position, but would not have been entitled to damages. *See Duff v. Draper,* 98 Idaho 379, 565 P.2d 572 (1977). However, the evidence as to whether Nelson was in default to NBC Leasing when World Wide took the pivot was inconclusive. As this case is being remanded, we do not decide this issue.

## C

■ Finally, we reach the issue raised in Nelson's cross-appeal. Nelson requests that if this case is remanded for a retrial then the jury should be instructed on punitive damages. We note that to justify an award of punitive damages, the conduct of the wrongdoer must be wanton, malicious or gross and outrageous or imply malice or oppression. *Linscott v. Rainier National Life Ins. Co.,* 100 Idaho 854, 606 P.2d 958 (1980); *Davis v. Gage,* 106 Idaho 735, 682 P.2d 1282 (Ct.App.1984). Further, a district court should rarely, if ever, award punitive damages absent a likelihood of future bad conduct. *Davis v. Gage, supra.* Our Supreme Court has recently held that an award of punitive damages will be sus-

tained on appeal "only when it is shown that the defendant acted in a manner that was 'an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or disregard for its likely consequences.'" *Cheney v. Palos Verdes Inv. Corp.* 104 Idaho 897, 905, 665 P.2d 661, 669 (1983) (*quoting Hatfield v. Max Rouse & Sons Northwest,* 100 Idaho 840, 851, 606 P.2d 944, 955 (1980)). Here the evidence construed most favorably to respondent showed simply that World Wide and its agent were negligent in selecting the two pivots it repossessed. Upon the record before us, the district court did not err in refusing to submit the question of punitive damages to the jury.

In summary, we uphold the district court's exercise of jurisdiction over the parties and this suit. We uphold the jury's finding that World Wide, acting through its agent, did convert the NBC pivot. We vacate the judgment as to damages and remand for a new trial to determine what, if any, recovery the Nelsons should receive as a result of the conversion. No costs or attorney fees.

WALTERS, C.J., and BURNETT, J., concur.