824 P.2d 151

**CUDDY MOUNTAIN CONCRETE, INC., an Idaho corporation, Plaintiff–Respondent,**

v.

**CITADEL CONSTRUCTION, INC., a Washington corporation, Defendant–Appellant.**

**No. 18701.**

Court of Appeals of Idaho.

Jan. 2, 1992.

222

Evans, Craven & Lackie, Coeur d'Alene, for appellant. Jarold P. Cartwright, Coeur d'Alene, argued.

Steven Millemann, McCall, for respondent.

SILAK, Judge.

Citadel Construction was the general contractor for the construction of a Shopko store in Lewiston, Idaho. Cuddy Mountain Concrete, the concrete subcontractor, brought a breach of contract action against Citadel after Citadel terminated its subcontract. Following a trial, the jury awarded Cuddy Mountain $74,000 on its breach of contract claim, which included lost profits and punitive damages. The trial court denied Citadel's motion for a new trial and its motion for a judgment notwithstanding the verdict. Citadel has appealed this decision. For the reasons stated below, we affirm the judgment of the district court.

## I. FACTS AND PROCEDURAL BACKGROUND

On March 23, 1987, Cuddy Mountain and Citadel entered into a written contract titled "Subcontract Agreement." Cuddy Mountain agreed to provide labor and all incidental materials to build the concrete footings, pads, foundation walls, and all concrete flatwork for the construction of a Shopko store in Lewiston. Citadel agreed to pay Cuddy Mountain $92,209 for its work. The Subcontract Agreement incorporated the terms of the contract between Citadel and Shopko. One of the terms of the Citadel–Shopko contract requires seven days' written notice before the contractor or a subcontractor can be terminated for cause.

Cuddy Mountain began work on the project in April, 1987. The parties presented conflicting testimony on the issue whether a work schedule existed and whether the schedule was modified at daily and weekly meetings. Rainy weather affected the ability of both parties to complete their work.

The most divisive problems occurred in the middle of May. On May 12, Larry Bratcher, owner of Cuddy Mountain, stopped work because of rain. Larry Hueter, project manager for Citadel, became angry and told Bratcher to keep pouring concrete even though the rain could affect the quality of the work; nevertheless, Bratcher refused to continue working.

Hueter summoned Bratcher to the job shack later that day for a meeting to discuss how Cuddy Mountain was going to finish the project. During the meeting, Hueter told Bratcher that Shopko was dissatisfied with Bratcher's work. Hueter mentioned three specific complaints: there were too many concrete workers at the job site; the quality of the work was poor; and Cuddy Mountain failed to provide a "pour" schedule. Hueter told Bratcher that Cuddy Mountain needed to improve its performance or he would seek another concrete subcontractor. A heated, acrimonious exchange ensued. From this point on, communications between Citadel and Cuddy Mountain deteriorated rapidly.

On May 15, more time was lost because of bad weather. Bratcher cancelled his crew. This displeased Rick Walther, the construction manager for Citadel, because he felt that other work could have been done. Walther asked Cuddy Mountain to work the following Saturday to make up for the time lost due to rain. Cuddy Mountain declined because it already had other commitments.

There was conflicting testimony regarding the effect of Cuddy Mountain's allegedly slow progress. Hueter testified that, on a project of this nature, the concrete subcontractor should only require minimum supervision from the general contractor, but that he had had to heavily assist Cuddy Mountain with its work. Bratcher testified that he was never behind schedule. Hueter disagreed and testified that Cuddy Mountain was not performing its work in a manner consistent with the flow of the project.

On May 18, Hueter faxed a termination letter to Cuddy Mountain without having given Cuddy Mountain the required seven-day written notice. Hueter was frustrated with Cuddy Mountain's poor production and lack of commitment to the job. Prior to the termination, Hueter met with a replacement contractor, Kirby Prendiville, who was able to begin working the day after Cuddy Mountain was fired. Prendiville and Citadel completed the concrete work eight days behind the original schedule. After being terminated by Citadel, Cuddy Mountain obtained a contract for a small construction project at the Culdesac Granary.

After Cuddy Mountain was terminated, Hueter asked Walther to supplement the daily reports for the period prior to the termination with comments regarding Cuddy Mountain's performance. Hueter told Walther that he wanted a more specific record of Cuddy Mountain's work in case something happened after the termination. Walther had written the original reports on a daily basis as the work progressed. The new comments were written on the original reports. There is no indication on the face of the records that they were written at a later time. Walther testified that he did not falsify the records in any way and that he did not intend to create the impression that the additional comments were written contemporaneously with the original daily reports. Tom Rogers, Shopko's on-site representative, also drafted a report regarding Cuddy Mountain's substandard performance. Rogers dated this report May 19 but actually did not write the report until July. The report emphasized the inexperience of Cuddy Mountain's crew and lack of supervision as the cause of the slow progress on the Shopko project.

The breach of contract theory was tried on the basis that Cuddy's performance was adequate, that the termination without seven days' notice violated the contract, and that Citadel's conduct was egregious in terms of the manner of communication, and in terms of the falsification of documents later. Cuddy Mountain claimed several different components of contract damages. Cuddy Mountain's total bid for the Shopko project was $92,209. As of May 18, 1987, the date of its termination, Cuddy Mountain had performed $1,164 worth of extra work, bringing the total contract value of the work to $93,373. Citadel paid Cuddy Mountain $34,620.30 for the work it had performed prior to termination. At trial, Cuddy Mountain claimed it was entitled to an additional $24,340 for the work completed prior to termination. This amount does not include $5,965 in liens which were satisfied by Citadel. The jury awarded Cuddy

Mountain $24,341 as additional payment for the work it completed prior to termination. The jury further awarded $25,000 in punitive damages, $9,300 in lost profits, and $14,700 for interest on an operating loan which had not been repaid.

Citadel filed a motion for judgment notwithstanding the verdict pursuant to I.R.C.P. 50(b), a motion to alter or amend the judgment pursuant to I.R.C.P. 59(e), and a motion for a new trial pursuant to I.R.C.P. 59(a)(5) (excessive damages), I.R.C.P. 59(a)(6) (insufficiency of the evidence), and I.R.C.P. 59(a)(7) (error of law). The trial court issued an opinion and order denying Citadel's motions, with the exception that the court granted Citadel's post-trial motion for judgment notwithstanding the verdict with regard to the award of interest on the operating loan. The court found that Cuddy Mountain had not proved that this was a natural and ordinary consequence of Citadel's breach of contract and could not have been "reasonably expected by the parties to the contract at the time the contract was made." No appeal was taken from this ruling.

After the trial court denied Citadel's motions, Cuddy Mountain filed a motion for pre-judgment interest; the court granted $8,850.76 in pre-judgment interest on the award of the value of work completed, and $3,209.94 in pre-judgment interest on the award for lost profit. The court also awarded costs and attorney fees. Citadel has not appealed from the district court's orders awarding pre-judgment interest, costs and attorney fees.

Citadel appeals from the decision of the jury as to contract damages, lost profits, and punitive damages. Citadel also appeals from the trial court's order denying Citadel's motions for judgment n.o.v., new trial, and amendment of judgment. Citadel presents four arguments on different aspects of the damages awards: first, that there was insufficient evidence to support the jury's monetary award for the value of the work completed; second, that the evidence supporting the jury's award of damages for lost profits was speculative; third, that the court erred in submitting the issue

of punitive damages to the jury; and fourth, that there was insufficient evidence to support a conclusion that Citadel's actions in terminating Cuddy Mountain were deliberate and malicious.

## II. VALUE OF WORK COMPLETED

■ We turn first to the question whether there was sufficient evidence to support the jury's award of $24,341 for the value of the work that Cuddy Mountain completed. Citadel moved for judgment n.o.v. and/or new trial. A trial court's decision concerning a new trial will not be overturned on appeal absent an abuse of discretion; however, a district court's decision regarding a judgment n.o.v. will be reviewed to determine whether there was substantial, competent evidence to support the jury's verdict. *See Brand S Corp. v. King*, 102 Idaho 731, 732–33, 639 P.2d 429, 430–31 (1981). Because Citadel has presented no arguments on appeal to show that the district court abused its discretion by refusing to grant a new trial on the issue of the value of the work completed, we affirm the district court's order denying the new trial motion on that ground.

■ We turn then to the question whether the district court erred in refusing to grant judgment n.o.v. Before examining the evidence, it must be noted that, upon a motion for judgment n.o.v., the moving party admits the truth of the adverse evidence and every inference that may be legitimately drawn from that evidence. *Brand S Corp.*, 102 Idaho at 733, 639 P.2d at 431 (citing *Mann v. Safeway Stores, Inc.*, 95 Idaho 732, 518 P.2d 1194 (1974)). Therefore, because Citadel admits the truth of the adverse evidence, in determining its sufficiency we will not examine any conflicting evidence that was presented to refute the amount of damages Cuddy Mountain claimed for the breach of contract claim.

■ Cuddy Mountain presented two different methods for calculating the value of the work it completed on the Shopko project. The first method was to calculate the value of the work performed prior to

the termination. The second method was to calculate the cost to complete the project from the time of the termination and to then subtract the cost of the remaining work from Cuddy Mountain's bid of $93,373. Under both these methods, the evidence presented at trial supported Cuddy Mountain's claim to the approximate amount the jury awarded.

To prove the first method of calculating damages, Cuddy Mountain presented evidence that it had completed the most difficult areas of the project prior to the termination. Those areas were more costly to set up and to pour than the remaining interior flatwork. The work completed required pumping up into and underneath the mezzanine, pouring along the walls, pouring around plumbing fixtures, and the placement of wire mesh. The evidence showed that this work is time consuming, labor intensive, and expensive. The work left to be done was predominately the pouring of open bays which was the easiest work. Cuddy Mountain also produced evidence that, on the basis of the total dollar value of the concrete work completed versus that of the concrete work that remained to be done, it had completed 63 percent of the concrete work.

To prove the second method of evaluating contract damages, Cuddy Mountain presented the testimony of an expert witness. The district court correctly noted that it was up to the jury to evaluate the credibility of the expert witness. Cuddy Mountain's expert witness, a construction company project manager and estimator, testified that the cost to complete the work would have been $34,633. Subtracting this amount from Cuddy Mountain's original bid leaves a remainder of $58,740 which would be the value of the work completed. Citadel paid Cuddy Mountain $34,620. Combining this amount with the amount awarded by the jury, which is $24,341, equals $58,961. Thus, the jury award was within $200 of the amount left on Cuddy Mountain's bid as calculated by Cuddy Mountain's expert witness. Based on this analysis, there is substantial, competent evidence to support the jury's verdict.

## III.  LOST PROFITS

We apply essentially the same analysis to the question whether the district court erred in declining to grant Citadel's motion for a new trial or judgment n.o.v. on the issue of lost profits. Again, Citadel has presented no basis upon which we could find that the district court abused its discretion in refusing to grant a new trial on this issue. In reviewing the record in this case, we conclude that there is substantial, competent evidence to support the jury's award of lost profits.

The requirements for recovery of lost profits are first, that the damages be proved with reasonable certainty and second that they were within the contemplation of the parties. *Brown's Tie & Lumber v. Chicago Title*, 115 Idaho 56, 61, 764 P.2d 423, 428 (1988) (citing *Nelson v. World Wide Lease, Inc.*, 110 Idaho 369, 378, 716 P.2d 513, 522 (Ct.App.1986)). The test for reasonable certainty has been held to be a requirement that damages be taken out of the realm of speculation. *Lamb v. Robinson*, 101 Idaho 703, 705, 620 P.2d 276, 278 (1980).

There was evidence at trial from which the jury could have inferred that Cuddy Mountain would make a profit from its work on the Shopko project. Bratcher testified regarding the amount of profit Cuddy Mountain would have made had it had the opportunity to complete the project. Having reviewed the costs for labor and materials, Bratcher concluded that the total cost to Cuddy Mountain for completing the project would have been $18,000. Bratcher allowed an additional $4,680 for demobilization, contingencies, and work corrections. Subtracting these costs from the balance left on Cuddy Mountain's bid left a net profit of $9,298.

Citadel argues that Bratcher's own testimony proves that part of the lost profit damages were mitigated because Cuddy Mountain accepted a small construction job at the Culdesac Granary shortly after having been terminated. On cross examination, Bratcher stated that he had made a $4,000 profit on that job. On re-direct, he testified that he had not reviewed his company's records regarding the Culdesac

Granary project, that he did not take a wage from that job, and that he could not testify accurately that Cuddy Mountain had made any profit on the job. Apparently, counsel for Cuddy Mountain successfully rehabilitated Bratcher's testimony. Drawing the inference most favorable to Cuddy Mountain, the jury must have found Bratcher's testimony on re-direct to be the most believable evidence and discounted the earlier statement made during cross-examination.

## IV. PUNITIVE DAMAGES

█ We turn next to the issue of punitive or exemplary damages. At the time this cause of action accrued, there were essentially three steps at which the trial court played a role in determining an award of punitive damages. First, the trial court has a discretionary role in deciding whether to submit the issue of punitive damages to the trier of fact. *Soria v. Sierra Pacific Airlines, Inc.,* 111 Idaho 594, 611, 726 P.2d 706, 723 (1986). Second, the trial court has authority to order a new trial, if, in its judgment, damages are excessive or inadequate. *Cheney v. Palos Verdes Inv. Corp.,* 104 Idaho 897, 904, 665 P.2d 661, 668 (1983). As a third alternative, the trial court may reduce an excessive jury award, order remittiturs of damages, or condition a new trial on the acceptance of an additur or remittitur. *Id.* at 904, 665 P.2d at 668. On appeal, Citadel argues that the district court erred at each step of its determinations.

We turn first to the question whether the trial court erred in submitting the issue of punitive damages to the jury. The Idaho Supreme Court recently articulated the standard of review of a trial court's decision whether to submit the question of punitive damages to the jury. In *Garnett v. Transamerica Ins. Services,* 118 Idaho 769, 800 P.2d 656 (1990), which upheld an award of punitive damages against an insurance company that had mishandled a claim, the Court summarized prior case law regarding the standard of review of a trial court's decision to allow the jury to consid-

er the issue of punitive damages. The Court observed:

We have limited our role on reviewing the decision of the trial court to allow the jury to consider an award of punitive damages. In *Soria v. Sierra Pacific Airlines, Inc.,* 111 Idaho 594, 611, 726 P.2d 706, 723 (1986), we said: "The decision whether to submit the issue of punitive damages to the trier of fact rests with the discretion of the trial court."

In addressing whether the trial court abused its discretion in allowing the jury to consider punitive damages, both *Cheney* and *Soria* focus on the sufficiency of the evidence to support the jury's award....

As we interpret [the] abuse-of-discretion standard of review set forth in *Cheney* and *Soria,* it is essentially a substantial evidence standard. *See Edmark Motors, Inc. v. Twin Cities Toyota, Inc.,* 111 Idaho 846, 850, 727 P.2d 1274, 1278 (Ct.App.1986) (review denied) ("Cheney does not explicitly identify the standard of appellate review governing a decision to award punitive damages. However, our task logically should be to determine whether the record contains substantial evidence to support the jury's implicit finding of the circumstances described in Cheney's broad guideline.")

*Garnett,* 118 Idaho at 781, 800 P.2d at 668. *Cheney v. Palos Verdes Inv. Corp.,* 104 Idaho 897, 665 P.2d 661 (1983), referred to above, is the seminal case on the modern doctrine of punitive damages in Idaho.

*Cheney* was the first of a modern line of cases on the issue of punitive damages to depart from the former rigid categorization approach to the type of conduct which would sustain an award of punitive damages. *Cheney* articulated a more descriptive and more flexible approach to punitive damages by describing the defendant's conduct as follows:

An award of punitive damages will be sustained on appeal only when it is shown that the defendant acted in a manner that was "an extreme deviation from reasonable standards of conduct, and that the act was performed by the defen-

dant with an understanding of or disregard for its likely consequences." The justification for punitive damages must be that the defendant acted with an extremely harmful state of mind, whether that state of mind be termed "malice, oppression, fraud or gross negligence;" "malice, oppression, wantonness;" or simply "deliberate or willful."

*Cheney,* 104 Idaho at 905, 665 P.2d at 669 (citations omitted). Our Supreme Court has adhered to the principle that while punitive damages may be recovered in a contract action, they are not favored in the law and therefore should be awarded only in the most compelling circumstances; they should be awarded cautiously and within narrow limits. *See Jones v. Panhandle Distributors, Inc.,* 117 Idaho 750, 792 P.2d 315 (1990).

Applying the *Cheney* standard to the present case, we look at the evidence which would support an award of punitive damages. Citadel breached its contract with Cuddy Mountain by failing to give a seven-day written notice of termination. This fact alone is an insufficient basis for the award of punitive damages; but, the decision to terminate was made in an unprofessional manner. The evidence indicates that Hueter's decision to terminate the contract was conceived in frustration and consummated in anger. There is no evidence that Hueter gave any thought to the consequences his decision would have for Cuddy Mountain.

In fact, the termination caused financial hardship to Cuddy Mountain. Because of the termination, Cuddy Mountain was unable to repay its operating loan and has been unable to obtain credit. Both parties have disputed the value of the work performed by Cuddy Mountain. Citadel paid Cuddy Mountain $34,620.30 for the work Cuddy Mountain performed prior to termination. According to Citadel, Cuddy Mountain completed only 17 percent of the concrete work on the basis of the number of square feet that had been poured; however, Cuddy Mountain sought, and was awarded, payment for 69 percent of the concrete flat-work bid price. Cuddy Moun-

tain argued that the work which it completed was the most difficult and expensive concrete work in the project. Ultimately, the jury agreed with Cuddy Mountain's valuation of its work; however, this is not a clear indication of oppressive behavior on the part of Citadel. On the other hand, Citadel's refusal to pay the balance demanded could be seen as oppressive. There is no evidence that Citadel withheld payment in order to oppress Cuddy Mountain economically; but, Citadel had the upper hand in terms of bargaining power because it controlled whether or not Cuddy Mountain was paid. Citadel knew that Cuddy Mountain depended on the income from that job because Citadel had signed bank documents which helped Cuddy Mountain obtain its operating loan. Citadel's actions can be considered similar to the failure of the insurer in *Garnett* to pay the full cost of the reconstruction of the insured building following a fire, despite the efforts of the insureds and their attorney. The withholding of money in this case presents a slightly different case because there was a legitimate contractual dispute between the parties; however, this factor may take on the character of oppressive behavior in the marketplace when examined in juxtaposition to the rest of Citadel's actions. As was noted in *Linscott v. Rainier Nat. Life Ins. Co.,* 100 Idaho 854, 860–61, 606 P.2d 958, 964–65 (1980), punitive damages may be useful as a sanction against oppressive conduct in the marketplace.

Citadel's post-termination revision of the daily work reports is another factor which may indicate that Cuddy Mountain is entitled to punitive damages. After Hueter terminated Cuddy Mountain's contract, he instructed Walther to rewrite his daily reports to include criticism of Cuddy Mountain's work. Bratcher testified that the termination was the direct result of a personality conflict with Hueter. He also testified that there was no well-founded basis for Citadel's complaints about Cuddy Mountain's performance under the subcontract. This evidence is adequate to establish a deviation from reasonable business conduct. The question which is presented

to us is whether the deviation is so extreme that it justifies an award of punitive damages.

There is no conduct here which rises to the level of outrage similar to that usually found in the commission of a crime or an intentional tort. We note that Hueter ordered Walther to rewrite his daily reports and that this could be construed as evidence of fraudulent intent. On the other hand, while altering business records shows a lack of integrity and common sense, the criticisms which were added seem to reflect an honest frustration with Cuddy Mountain's level of performance.

The facts here present a close question. Several recent decisions on punitive damages from our Supreme Court are instructive. These decisions further illuminate the type and quantum of proof necessary to meet the *Cheney* definition of extreme deviation from reasonable standards of conduct.

In *Jones v. Panhandle Distributors*, 117 Idaho 750, 792 P.2d 315 (1990), Panhandle sold its franchise right to distribute Schlitz and Miller beer to Jones, contingent on obtaining approval of the transfer from those two brewing companies. Jones alleged that Panhandle acted covertly to block the consents to the transfer. Following a trial, the jury awarded $10,700 in punitive damages, but the trial court granted judgment notwithstanding the verdict. Our Supreme Court held that given the unique factor of the dual conditions precedent, the trial court did not abuse its discretion, because while Panhandle's interference to block Miller's consent to the transfer was egregious, Schlitz decided independently to refuse to consent to the transfer. Without Schlitz's consent, the sale could not have been completed. The Court isolated the element of causation and found that the defendant's objectionable behavior did not result in harm to the plaintiff. Thus, the evidence as a whole precluded the award of punitive damages.

Our Supreme Court isolated a similar element in *Eddins Construction, Inc. v. Bernard*, 119 Idaho 340, 806 P.2d 433 (1991), which involved a dispute between the general contractor and an independent contractor over the terms of a construction contract. Eddins Construction, the independent contractor, was responsible for performing the excavation and clearing work on a road project for the Department of Lands (DOL). After the work began, Lee Eddins, the president of Eddins Construction, discovered that the job was bigger than originally estimated. Eddins stopped work until he was able to obtain an oral promise from the contractor's agent for an increase in the contract price. In the meantime, the contractor's agent told the DOL that all the people working on the job were employees of the general contractor. The agent made this statement in order to avoid a state requirement that all subcontractors working on a state contract possess a public works contractor's license. During the work on the project, Eddins severed a power line which in turn caused a fire. The repair costs and fire suppression costs were deducted from Eddins' compensation. Eddins sued the general contractor and its agent for breach of contract and sought punitive damages. One of Eddins' contentions was that the contractor's misrepresentations to the DOL were evidence of a harmful state of mind. Following a trial, a jury awarded Eddins $13,000 in contract damages and $6,000 in punitive damages. On appeal, our Supreme Court noted that the general contractor's practices in running a public works project may not have been correct, but the practices did not indicate a harmful state of mind toward Eddins. Again, as in *Jones*, the Court isolated the element of causation. The Court noted also, in contrast to *Garnett*, that Eddins presented no expert testimony of an extreme deviation from reasonable standards of conduct. The Supreme Court reversed the award of punitive damages on the basis that the general contractor's misrepresentations did not indicate a harmful state of mind toward the plaintiff, but would possibly show a harmful state of mind toward the state agency.

In *Garnett*, our Supreme Court upheld an award of punitive damages against an insurance company, Transamerica, which had refused to pay the full cost of recon-

structing an insured building destroyed by fire. Transamerica's file did not contain letters which the insured's attorney had sent regarding the status of the reconstruction project. Moreover, Transamerica justified its refusal to pay for the full cost of reconstruction on the basis that the contractor's bid included improvements required by the local building code, the cost of which were allegedly not covered in the insurance contract. In addition, Transamerica based its refusal on a claim that the insured had not provided a detailed summary of costs. The plaintiff presented expert testimony on the issue of handling insurance claims. The insurance expert described Transamerica's claims file as "an extreme deviation of the standard of care in claims handling in this part of the country at this time." The Court took into consideration the expert testimony and the reasons Transamerica gave to justify its failure to pay for the completion of the reconstruction. Having reviewed the record, the Court found Transamerica's claims to be spurious and affirmed the judgment. 118 Idaho 769, 800 P.2d 656 (1990).

In *Magic Valley Radiology Associates v. Professional Business Services, Inc.*, 119 Idaho 558, 808 P.2d 1303 (1991), the radiologists had a contract for medical billing services with Professional Business Services (PBS). When the contract for medical billing services ended, PBS refused to turn over the radiologists' account summaries. PBS claimed that it needed the account summaries in order to substantiate claims against the radiologists for commissions. Following a bench trial, the district court found that PBS' retention of the account summaries was "groundless and irrational" because the summaries were meaningless when dissociated from the accounts to which they pertained. The trial court also found that PBS retained the account summaries in order to extort immediate payment from the radiologists and to harass them by delaying assimilation of accounts by their new billing service. On appeal, the Supreme Court upheld the award of punitive damages because the evidence indicated that PBS had acted with disregard of the likely consequences and with an extremely harmful state of mind.

In *Hoglan v. First Security Bank of Idaho, N.A.*, 120 Idaho 682, 819 P.2d 100 (1991), a jury awarded the plaintiffs $20,000 in compensatory damages and $200,000 in punitive damages after First Security breached its contract with the Hoglans and published statements which undermined their credit rating. On appeal, the Supreme Court vacated the award of punitive damages because the bank's negligence, which took more than one year to correct, was the result of its bureaucratic procedures and did not evidence a harmful state of mind.

Many of the cases discussed above arise in the context of contractual relationships. *See also Blaser v. Riceci*, 119 Idaho 834, 810 P.2d 1120 (1991) (reversing award of punitive damages against guardian of elderly woman). As evidenced by the many dissents and special concurrences, each appears to present a close question of whether the particular conduct at issue meets the criteria of *Cheney*. The award of punitive damages in the context of a contractual relationship seems to be based on conduct which is unreasonable and irrational in the business context. The acts show a lack of professional regard for the consequences of the breach of the contractual agreement. When parties enter into a contract, they assume not only the contractual duties imposed by their agreement, they assume a duty to act in good faith. *Luzar v. Western Sur. Co.*, 107 Idaho 693, 696, 692 P.2d 337, 340 (1984). If a party breaches its duty to act in good faith, it may be liable for not only the usual damages resulting from the breach, but also punitive damages.

In addition to oppressive behavior in a business context, there are other factors which play a determinative role in deciding whether there is substantial evidence of an extreme deviation from standards of reasonable conduct: (1) the presence of expert testimony; (2) whether the unreasonable conduct actually caused harm to the plaintiff; (3) whether there is a special relationship between the parties, as

in the *Garnett* insured-insurer relationship; (4) proof of a continuing course of oppressive conduct; and (5) proof of the actor's knowledge of the likely consequences of the conduct.

Applying these standards to the present case, we conclude that the district court did not err in submitting the issue of punitive damages to the jury. There is no question that Citadel breached the terms of its contract with Cuddy Mountain by failing to give at least seven days' written notice of its intent to terminate the contract. Cuddy Mountain presented no expert testimony regarding the extent of Citadel's deviation from reasonable conduct; however, the evidence presented at trial indicates that Hueter made the decision to terminate Cuddy Mountain's contract in an unreasonable manner and with no regard for the consequences of the breach of the contractual relationship. There was arguably a continuing course of oppressive conduct on the part of Citadel because it terminated Cuddy Mountain, falsified the daily reports, and refused to pay Cuddy Mountain on the basis of the value of the work performed. Looking at the factor of causation, there is no question that Citadel's actions caused harm to Cuddy Mountain. Having reviewed the record, we conclude that there is substantial evidence which indicates that Citadel's actions were an extreme deviation from reasonable standards of business conduct. Because punitive damages are an appropriate sanction for oppressive conduct in the marketplace, we conclude that the district court did not err in submitting the issue of punitive damages to the jury.

■ The next question is whether the district court erred in declining Citadel's motion for a new trial. Citadel argues that the trial court should have granted a new trial under I.R.C.P. 59(a)(5) or I.R.C.P. 59(a)(6) on the issue of punitive damages. I.R.C.P. 59(a)(6) permits the trial court to grant a new trial on all or part of the issues in an action by reason of the "[i]nsufficiency of the evidence to justify the verdict or other decision, or that it is against the law." It is well established that a trial court may grant a new trial based on I.R.C.P. 59(a)(6) where, after weighing all the evidence, including the court's own determination of the credibility of the witnesses, the court concludes that the verdict is not in accord with its own assessment of the clear weight of the evidence. *Quick v. Crane*, 111 Idaho 759, 766, 727 P.2d 1187, 1194 (1986); *see also O'Dell v. Basabe*, 119 Idaho 796, 830–33, 810 P.2d 1082, 1116–19 (1991) (Johnson, J., concurring in part and dissenting in part). In its written order in this case, the trial court stated that there was sufficient evidence to support an award of punitive damages. We have addressed this issue earlier in our opinion and will not reiterate that discussion here. There is substantial competent evidence to support the jury's award of punitive damages and we will not reverse the district court's decision denying a new trial.

■ Citadel also claims that the award of punitive damages should be overturned because it was awarded as the result of passion or prejudice. In *Quick*, our Supreme Court stated the rule that a trial court must follow when deciding a motion made pursuant to I.R.C.P. 59(a)(5):

Where a motion for a new trial is premised on inadequate or excessive damages, the trial court must weigh the evidence and then compare the jury's award to what he would have given had there been no jury. If the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the verdict ought not stand. It need not be proven that there was in fact passion or prejudice nor is it necessary to point to such in the record. The appearance of such is sufficient. A trial court is not restricted to ruling a verdict inadequate or excessive as a 'matter of law.' [Citation omitted.] Additionally, the rule that a verdict will not be set aside when supported by substantial but conflicting evidence has no application to [a] trial court ruling upon a motion for a new trial.

*Quick*, 111 Idaho at 768, 727 P.2d at 1196; *Dinneen v. Finch*, 100 Idaho 620, 625–26, 603 P.2d 575, 580–81 (1979). On appeal, we

will not reverse a trial court's order denying a motion for a new trial "unless the court has *manifestly* abused the wide discretion vested in it." *Quick*, 111 Idaho at 770, 727 P.2d at 1198 [emphasis in original]. Appellate review of the trial court's exercise of discretion in this regard focuses upon the reasons stated by the trial court for granting or denying a motion for new trial and/or alternative additurs or remittiturs. The trial court must state its reasons with particularity unless those reasons are obvious from the record itself. *O'Dell*, 119 Idaho at 806, 810 P.2d at 1092 (case remanded because trial court failed to state factual findings and the particular rule of the I.R.C.P. under which it was acting when it denied motion for new trial on issue of punitive damages); *Quick*, 111 Idaho at 772–773, 727 P.2d at 1200–01; *Sheets v. Agro–West, Inc.*, 104 Idaho 880, 888, 664 P.2d 787, 795 (Ct.App.1983).

In the present case the trial court discussed both the factual reasons for its decision to deny Citadel's motion for a new trial, and I.R.C.P. 59(a)(5), the rule under which it was acting. Citadel has presented us with nothing other than bare assertions on this issue. It has failed to support its contentions with any reference to specific matters which would indicate that the verdict was based on passion and prejudice rather than reason. The jury awarded Cuddy Mountain $25,000 in punitive damages. We note that this amount is less than the total amount of damages awarded for lost profits and the value of work completed. In the absence of any reasonable argument to the contrary, we fail to see how this amount is excessive. Moreover, if the facts proved at trial with respect to Citadel's business conduct tended to arouse the legitimate concern of the jury, we fail to see how this constitutes passion and prejudice. Thus, we decline to overrule the trial court's order on appeal.

Joined to Citadel's motion for a new trial on the issue of punitive damages was a motion for judgment notwithstanding the verdict. Our Supreme Court provided a framework for the analysis of this issue in *Quick:*

A motion for judgment n.o.v. based on I.R.C.P. 50(b) is treated as simply a delayed motion for a directed verdict and the standard for both is the same. In making the motion, the defendants necessarily admitted the truth of all of the plaintiffs' evidence and every legitimate inference that could be drawn therefrom in the light most favorable to the plaintiff. Whether that issue is sufficient to create an issue of fact is purely a question of law. The question is not whether there is literally no evidence supporting the party against whom the motion is made, but whether there is substantial evidence upon which the jury could properly find a verdict for that party. Hence, the trial judge is not free to weigh the evidence or pass on the credibility of witnesses and make his own separate findings of fact and compare them to the jury's findings as he would in deciding on a motion for a new trial. *Rather the trial judge must view all of the evidence and all inferences drawn therefrom in favor of the non-moving party, and decide if there was substantial evidence to justify submitting the case to the jury, or, in other words, that there can be but one conclusion as to the verdict that reasonable minds could have reached.* Thus, the function of I.R.C.P. 50(b) is to give the trial court the last opportunity to order the judgment that the law requires.

*Quick*, 111 Idaho at 763–64, 727 P.2d at 1191–92 (citations omitted, emphasis added). As our Supreme Court has further noted, an evolutionary change has occurred in the documentation requirements imposed upon trial courts faced with these post-trial motions. *O'Dell*, 119 Idaho at 805–06, 810 P.2d at 1091–92. Thus, the questions presented to us on review of this issue in this case are whether there was substantial evidence upon which the jury could have reached its verdict and whether the trial court stated with sufficient particularity the reasons for its ruling on the motion for judgment notwithstanding the verdict or whether the basis for that ruling was obvious from the record itself. See *O'Dell*, 119 Idaho at 806–07, 810 P.2d at 1092–93.

In our discussion of whether the issue of punitive damages should have been submitted to the jury, we concluded that there was sufficient evidence upon which a jury could have reached the decision it did. We have examined the trial court's written opinion and order regarding its denial of Citadel's motion for a new trial. The trial court discussed the rule under which it was acting and discussed in detail the evidence which supported the award of punitive damages. Thus, we conclude that the district court made no error in denying Citadel's motion for judgment notwithstanding the verdict.

## V. ATTORNEY FEES ON APPEAL

Cuddy Mountain has asked for attorney fees on appeal. Idaho Code § 12–120(3) provides as follows:

> In any civil action to recover on an open account, account stated, note, bill, negotiable instrument, guaranty, *or contract relating to the purchase or sale of goods, wares, merchandise, or services and in any commercial transaction* unless otherwise provided by law, the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs.
>
> The term "commercial transaction" is defined to mean all transactions except transactions for personal or household purposes.

I.C. § 12–120(3) (emphasis added). The contract between Citadel and Cuddy Mountain was a contract for the sale of services in that Citadel hired Cuddy Mountain to perform the work of pouring concrete at the Shopko building project. It was also a commercial transaction because it encompassed an agreement between two professional construction companies in a business context. Cuddy Mountain is clearly the prevailing party in this appeal. Consequently, we award costs and attorney fees to Cuddy Mountain.

## VI. CONCLUSION

In conclusion, the rulings of the district court on the post-trial motions by Citadel on the issues of payment for the value of work performed, lost profits, and punitive damages, are affirmed. Costs and attorney fees to respondent. I.C. § 12–120; I.A.R. 40 and 41.

WALTERS, C.J., concurs.

SWANSTROM, Judge, concurring in part and dissenting in part:

I respectfully dissent from the majority's conclusion regarding the punitive damage award, and fees on appeal. Although I agree with the majority's analysis of the case law of punitive damages, I do not believe that the conduct of Citadel amounted to such an extreme deviation from the usual standard of conduct in a business transaction as to support an award of punitive damages. In my view, Citadel's actions were not outrageous or malicious, even though Citadel breached the contract. A simple breach of contract does not warrant the imposition of punitive damages. Accordingly, I would reverse the order of the district court denying the motion for judgment notwithstanding the verdict as to the punitive damages award and would not award attorney fees or costs on appeal to Cuddy Mountain.