979 P.2d 1207

**GENERAL AUTO PARTS CO., INC., an Idaho corporation, Plaintiff–Appellant—Cross Respondent,**

v.

**GENUINE PARTS COMPANY, a Georgia corporation, Defendant–Respondent— Cross Appellant.**

No. 24437.

Supreme Court of Idaho,
Boise, March 1999 Term.

June 17, 1999.

Law Offices of Comstock & Bush and Peter J. Boyd, Boise, for appellant. John A. Bush argued.

Hawley, Troxell, Ennis & Hawley, Boise, and Alston & Bird, LLP, Atlanta, Georgia, for respondent. Eugene A. Ritti argued.

SCHROEDER, Justice.

General Auto Parts, Inc. (General) brought this action asserting that Genuine Parts Company (GPC) breached an oral contract wherein GPC allegedly promised the current owner of General, Frank Workland, the exclusive right to sell NAPA automotive parts in Boise. Following trial, the jury returned a verdict in favor of General and against GPC in the amount of $100,000. General appealed the trial court's decision denying General's motion to amend its complaint to include a claim for punitive damages and limiting General's measure of damages to lost profits. GPC cross appealed the trial court's decision denying GPC's motion for a directed verdict on General's breach of contract claim. The Court affirms the decisions of the district court.

## I.

## BACKGROUND AND PRIOR PROCEEDINGS

GPC owns and operates a nationwide network of distribution centers which sell NAPA auto parts. Frank Workland was the manager of a GPC store located in Spokane, Washington, in 1973. Roger Fitzgerald

(Fitzgerald), who was the general manager of the Spokane NAPA Distribution Center at that time, offered Frank Workland the opportunity to purchase two NAPA auto parts stores in Boise. The Boise stores were owned by General, which in turn was jointly owned by GPC and the manager of the Boise stores, Dennis Rigas.

Frank Workland testified that Fitzgerald promised him that he would have the exclusive right to operate NAPA stores in Boise "as long as there was a Workland running General Auto." Frank Workland agreed to purchase the Boise operation and secured partners to effectuate the purchase. His brother, Jim Workland (an attorney and one of the partners in the purchase of General), drafted the sales agreement and related documents. Jim Workland wanted to put an exclusive distributorship provision in the written agreement, but Fitzgerald asked him not to, stating that GPC could not enter into an exclusive distribution agreement due to a problem GPC had with the Federal Trade Commission (FTC). The Workland brothers did not investigate this statement, nor did they continue to press for a written exclusive distributorship agreement. They did ask for some assurance at which time Fitzgerald reassured them that a written exclusive agreement was not necessary and that Frank Workland would be "our man in Boise." The final contract documents, which implemented the purchase agreement between GPC and the Worklands, do not contain a provision for an exclusive distributorship.

Unbeknownst to the Worklands at the time, Fitzgerald's reference to a problem with the FTC related to a federal consent decree entered into between GPC and other NAPA members. The consent decree was the result of federal litigation and enjoined the parties involved from engaging in certain practices, including dividing territories among NAPA members and entering into agreements that determined the number, location and arrangements of jobbers. An independent NAPA store owner is referred to as a "jobber." NAPA stores can be owned either independently, jointly by GPC and another person, or by GPC alone.

Frank Workland and his wife, Paula Workland, bought the General shares owned by Jim Workland and another partner in 1978, becoming the sole shareholders of General. General continued to operate the two stores in Boise until 1988, when it closed its Overland Road store due to poor sales.

In 1990, GPC urged General to expand its business by either increasing inventory in its one remaining store or opening a new store. GPC helped General apply for business loans, but the two banks General approached denied the loan applications. General did not apply for any other loans or take other steps to increase its business.

In January 1991, GPC informed Frank Workland that it would begin selling NAPA auto parts to his competitor, Cal's Service Parts Company of Boise, Inc. (Cal's), which operated six auto parts stores in Boise. In January 1993, GPC purchased Cal's and began to operate the six stores as an internal division of GPC. Three of these six stores are located within two miles of General's sole location.

General filed suit against GPC, NAPA and Cal's in 1994, asserting seven causes of action: three claims under state antitrust laws, one claim under both the Fair Trade Act and the Consumer Protection Act, and claims for breach of contract and breach of the implied covenant of good faith and fair dealing. General later moved to voluntarily dismiss NAPA and stipulated to the entry of a summary judgment as to all claims against Cal's. GPC moved for summary judgment. The district court dismissed all of General's five statutory causes of action, but denied GPC's summary judgment on General's breach of contract claims.

On September 13, 1996, prior to trial on the breach of contract claims, General moved to amend its complaint to include a claim for punitive damages. No hearing was held on the motion due to the parties' stipulation to vacate the initial trial date of September 24, 1996, and reschedule trial for May 20, 1997. Thereafter, GPC moved to reconsider the district court's denial of its motion for summary judgment regarding General's breach of contract claims. The district court denied the motion.

On March 4, 1997, General filed a second motion for leave to amend its complaint to include a claim for punitive damages. GPC raised a procedural objection to the motion, arguing that it had not been timely filed pursuant to the original scheduling order entered on November 21, 1995. The district court denied both General's second motion to amend and General's subsequent motion to reconsider.

After both parties rested at trial, GPC moved for a directed verdict on General's breach of contract claim and the claim for breach of the implied covenant of good faith and fair dealing. The district court denied GPC's motion with respect to the breach of contract claim, concluding that there was sufficient evidence to send the case to the jury. The district court granted GPC's motion for a directed verdict with respect to the breach of the implied covenant claim on the basis that General had failed to demonstrate damages separate from the breach of contract claim.

The jury returned a special verdict in General's favor, finding that there was a contract, that GPC breached the contract, and that General sustained damages in the amount of $100,000 as a result of the breach. The district court entered judgment based upon the special verdict and subsequently entered a judgment on the dismissed statutory claims and claim for breach of the implied covenant.

General moved for a new trial on the issue of damages and, in the alternative, sought injunctive relief. The district court denied General's motion in its entirety and entered a supplemental judgment awarding costs and attorney fees to General. General appealed and GPC cross appealed.

## II.

### THE TRIAL COURT DID NOT ERR IN DENYING GENERAL'S MOTION TO AMEND ITS COMPLAINT TO INCLUDE A CLAIM FOR PUNITIVE DAMAGES.

The district court denied General's motion for leave to amend its complaint to include a claim for punitive damages because: (1) the motion was untimely pursuant to the scheduling order, and (2) General had failed to establish a reasonable likelihood of proving the necessary facts at trial to support an award of punitive damages. Although the district court stated a procedural basis for denying the motion to amend, it also decided the merits of the motion. This Court agrees with the district court's substantive ground for denying General's motion and will not address the district court's procedural ground.

### A. Standard of Review

■ As long as there is sufficient evidence to support the district court's decision not to allow the jury to consider punitive damages, this Court will give deference to that decision. *Fitzgerald v. Walker,* 121 Idaho 589, 593, 826 P.2d 1301, 1305 (1992). "Courts have much greater latitude where the decision is not to instruct on the issue [of punitive damages], in light of the law's natural tendency to disfavor punitive damages." *Id.* The question before this Court is whether the failure to instruct on punitive damages was so contrary to the facts of the case as to amount to an abuse of discretion under the deferential standard. *Id.*

### B. The District Court's Refusal To Instruct On Punitive Damages Was Not An Abuse Of Discretion.

Section 6–1604 of the Idaho Code (I.C.) provides that to receive an award of punitive damages, "the claimant must prove, by a preponderance of the evidence, oppressive, fraudulent, wanton, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted." I.C. § 6–1604(1). "[W]hile punitive damages may be recovered in a contract action, they are not favored in the law and therefore should be awarded only in the most compelling circumstances; they should be awarded cautiously and within narrow limits." *Cuddy Mountain Concrete, Inc. v. Citadel Constr., Inc.,* 121 Idaho 220, 227, 824 P.2d 151, 158 (Ct.App. 1992) (citing *Jones v. Panhandle Distrib., Inc.,* 117 Idaho 750, 792 P.2d 315 (1990)). The plaintiff must show

that the defendant acted in a manner that was "an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or disregard for its likely consequences." The justification for punitive damages must be that the defendant acted with an extremely harmful state of mind, whether that be termed "malice, oppression, fraud or gross negligence;" "malice, oppression, wantonness;" or simply "deliberate and willful."

*Walston v. Monumental Life Ins. Co.,* 129 Idaho 211, 220, 923 P.2d 456, 465 (1996) (quoting *Cheney v. Palos Verdes Inv. Corp.,* 104 Idaho 897, 665 P.2d 661 (1983)). *See also Taylor v. Browning,* 129 Idaho 483, 494, 927 P.2d 873, 884 (1996).

■ The district court determined that there was sufficient evidence for a jury to find that GPC intentionally and willfully breached the exclusivity contract with General. It also recognized that GPC claimed that it tried to assist General in expanding its business, and only when those efforts proved unsuccessful did it pursue the changeover of General's competitor, Cal's. Even assuming that the jury disbelieved GPC's claim that it tried to assist General, the district court concluded that there was no evidence of malice on GPC's behalf. The district court determined that GPC's breach was simply done in "pursuit of an economic opportunity" and did not amount to malicious or oppressive conduct. The district court's determination is supported by the record.

■ A breach of contract by itself is not sufficient to warrant an award of punitive damages. *See Taylor,* 129 Idaho at 494, 927 P.2d at 884 (affirming trial court's denial of plaintiff's request for punitive damages in breach of contract case); *Cuddy Mountain,* 121 Idaho at 227, 824 P.2d at 158 (fact that defendant breached contract with plaintiff by failing to give a seven-day written notice of termination alone is an insufficient basis for an award of punitive damages); *Dunn v. Ward,* 105 Idaho 354, 357, 670 P.2d 59, 62 (Ct.App.1983) (where plaintiff failed to present evidence of defendant's outrageous or willful action in breaching noncompetition clause contained in sale of business, plaintiff

was not entitled to award of punitive damages). General was required to establish a reasonable likelihood of proving that GPC "acted with an extremely harmful state of mind." *Walston,* 129 Idaho at 220, 923 P.2d at 465 (quoting *Cheney,* 104 Idaho at 905, 665 P.2d at 669).

General claims that GPC acted with an extremely harmful state of mind and acted with the specific intent to run General out of business. However, GPC presented evidence that its motive for changing over Cal's was simply to expand the NAPA business in the growing Boise market. The district court did not find that there was sufficient evidence to sustain General's claim that GPC intended to run General out of business when it granted GPC summary judgment on General's statutory claim under I.C. § 48–104, which prohibits any act done for the purpose of driving another person out of business. General did not appeal this decision by the district court.

General relies on *Linscott v. Rainier National Life Insurance Co.,* 100 Idaho 854, 606 P.2d 958 (1980) and *Cuddy Mountain Concrete, Inc. v. Citadel Construction, Inc.,* 121 Idaho 220, 824 P.2d 151 (Ct.App.1992), to support its claim that punitive damages are appropriate in this case. *Linscott* and *Cuddy Mountain,* however, are distinguishable on their facts and are not helpful to General.

*Linscott* involved an insurance company's wrongful refusal to honor a medical insurance policy it had issued for the Linscotts' daughter. The Court in *Linscott* affirmed the trial court's award of punitive damages after noting that the insurance company's refusal to honor the policy was "totally unjustified" and that the insurance company had acted in bad faith. 100 Idaho at 861, 606 P.2d at 965. The *Linscott* court qualified its decision by stating:

By way of a *caveat* to this opinion, it must be pointed out that nothing herein is to be construed as in any way approving the awarding of punitive damages in an ordinary breach of contract case. Punitive damages may only be considered in those cases where there has been alleged in the pleadings and proof of conduct by one party involving some element of *outrage*

similar to that usually found in the commission of crimes or torts done intentionally or with reckless indifference to the rights of the other party (*e.g.* fraud) or with an evil motive, (*e.g.* to vex, harass, annoy, injure or oppress) in conscious disregard of the rights of the injured person. *Id.* (emphasis added).

*Cuddy Mountain* involved a breach of contract claim arising from a contract between a general contractor (Citadel) and a subcontractor (Cuddy Mountain). Citadel terminated the contract without giving Cuddy Mountain the required seven-day written notice of termination. Citadel claimed that it terminated the contract because of Cuddy Mountain's poor performance. The court in *Cuddy Mountain* determined that the following behavior by Citadel constituted oppressive conduct sufficient to support an award of punitive damages: (1) the evidence showed that Citadel's decision to terminate "was conceived in frustration and consummated in anger" and there was no evidence that Citadel gave any thought to the consequences of its decision; (2) the termination in fact caused financial hardship to Cuddy Mountain; (3) Citadel refused to pay the balance Cuddy Mountain demanded for the work it had performed; (4) following termination, Citadel altered certain daily reports which had been prepared prior to the termination. 121 Idaho at 227–28, 824 P.2d at 158–59.

There is no evidence in this case that GPC acted in outrage or with an evil motive to specifically injure General. *Compare Davis v. Gage,* 106 Idaho 735, 738–39, 682 P.2d 1282, 1285–86 (Ct.App.1984) (punitive damages award appropriate in breach of noncompetition clause where defendant, among other things, tore down plaintiff's billboard advertising plaintiff's restaurant and opened a competing restaurant 200 feet from plaintiff's restaurant). The district court did not abuse its discretion in denying the motion to amend to add the claim for punitive damages.

## III.

### THE TRIAL COURT DID NOT ERR IN LIMITING GENERAL'S MEASURE OF DAMAGES.

■ At the close of General's case, GPC moved for a directed verdict on all claims, arguing, *inter alia,* that General had not proven any damages caused by the alleged breach of contract. General responded that the evidence showed that it had suffered damages as a consequence of the breach which could be measured in several different ways—loss of profits and loss of the value of the exclusive right. In terms of how to value the loss of the exclusive right, General argued that it should be a percentage of the net sales GPC estimated it would make after changing over Cal's. For example, the evidence showed that GPC estimated it would generate some $1.8 million in sales annually after changing over Cal's, minus the changeover cost of $1.6 million. General argued that it should be entitled to a percentage of these sales. The district court rejected General's theory of damages with regard to valuing the loss of the exclusive right, but concluded that there was sufficient evidence for the jury to determine the amount of losses General sustained.

GPC renewed its motion for a directed verdict on General's claim for breach of the implied covenant of good faith and fair dealing, arguing that General had not presented any evidence of damages separate from the damages resulting from the alleged breach of contract. The district court agreed and granted GPC's motion for directed verdict on General's implied covenant claim.

GPC moved for a ruling from the district court on the appropriate measure of damages. The district court again made it clear that lost profits was the only measure of damages. General challenges this ruling and claims that by erroneously limiting its measure of damages to lost profits the district court consequently erred in granting GPC a directed verdict on its claim for breach of the implied covenant of good faith and fair dealing.

■ The question of the proper measure of damages is a question of law which is reviewed *de novo. See Weitzel v. Jukich,* 73 Idaho 301, 305–07, 251 P.2d 542, 544–45 (1952). While this Court has never addressed the question of the proper measure

of damages for breach of an exclusive distributorship agreement, it has determined the proper measure of damages in actions involving a breach of a covenant not to compete. In the covenant not to compete cases, the proper measure of damages is the impairment of goodwill and the plaintiff's lost profits. *Vancil v. Anderson*, 71 Idaho 95, 104, 227 P.2d 74, 79 (1951); *Dunn v. Ward*, 105 Idaho 354, 356, 670 P.2d 59, 61 (Ct.App.1983). *See also Ryska v. Anderson*, 70 Idaho 207, 213–14, 214 P.2d 874, 877–78 (1950). This Court has recognized that the loss of goodwill and loss of profits are distinct types of damages. *See Ryska*, 70 Idaho at 212, 214 P.2d at 876; *Dunn*, 105 Idaho at 356, 670 P.2d at 61.

General argues that its exclusive right is a business asset similar to goodwill and that, accordingly, the district court should have allowed its damages to be measured both in terms of lost profits and loss of the exclusive right. There are several problems with treating the exclusive right in this case like goodwill. First, unlike goodwill, the exclusive right GPC granted to General is not transferrable. The exclusive right was promised to Frank Workland and would only last "as long as there was a Workland running General Auto." Because the right is not transferrable, it has no extrinsic value like goodwill. Furthermore, General never proposed a jury instruction or made an offer of proof before the district court with respect to the value of General's goodwill. Because General never argued its "goodwill" theory below, it is precluded from arguing the theory for the first time on appeal. *See Masters v. State*, 105 Idaho 197, 200, 668 P.2d 73, 76 (1983) (parties in an appeal are held to the theories on which a cause was tried in the trial court).

General's expert, Dr. Frankle, testified that he considered the fact that General had an exclusive right when he calculated General's future lost profits. To allow General to recover lost profits in addition to a percentage of GPC's sales affected after the breach would result in a windfall to General.

General did not present any evidence of damages distinct from the damages resulting from the breach of the exclusive contract.

Therefore, the district court's decision to grant a directed verdict to GPC on the breach of the implied covenant claim is affirmed.

## IV.

## THE TRIAL COURT DID NOT ERR IN REFUSING TO GRANT GPC'S MOTION FOR DIRECTED VERDICT.

GPC cross appealed the district court's decision denying its motion for directed verdict on General's breach of contract claim. GPC claims the district court erred by failing to recognize that: (1) the Statute of Frauds bars enforcement of the alleged contract; (2) the evidence shows that the parties had not agreed on material terms, which means there was no meeting of the minds and, therefore, there was no contract; (3) the alleged terms of the contract were too indefinite to be enforceable; and (4) General failed to prove that its alleged damages were caused by GPC. Because the same analysis applies to whether the parties agreed on material terms and whether the terms were too indefinite to be enforceable, the two issues will be addressed together.

### A. Standard of Review

When reviewing the disposition of a motion for a directed verdict under I.R.C.P. 50(a), [this Court must] utilize the same standard that governs the trial court's decision. That is, [this Court] must determine whether, admitting the truth of the adverse evidence and drawing every legitimate inference most favorably to the opposing party, there exists substantial evidence to justify submitting the case to the jury.

*Herrick v. Leuzinger*, 127 Idaho 293, 297, 900 P.2d 201, 205 (Ct.App.1995). "The 'substantial evidence' test does not require the evidence be uncontradicted. It requires only that the evidence be of sufficient quantity and probative value that reasonable minds could conclude that a verdict in favor of the party against whom the motion is made is proper." *All v. Smith's Management Corp.*, 109 Idaho 479, 480, 708 P.2d 884, 885 (1985).

### B. The Statute Of Frauds Does Not Bar Enforcement Of The Contract.

GPC argues that the Statute of Frauds bars enforcement of the oral contract for exclusivity because the contract cannot be performed within a year of its making. At the threshold, General argues that the Statute of Frauds issue was raised in GPC's motion for summary judgment and that the district court's decision denying GPC summary judgment on the issue is not reviewable. Aside from this argument, GPC renewed its motion with regard to the Statute of Frauds at the time it moved for directed verdict on General's breach of contract claim. The district court did not expressly rule on the Statute of Frauds when it denied GPC's motion for directed verdict. Nevertheless, because GPC raised the issue as a ground for its motion for directed verdict, the issue is reviewable by this Court. *See Hartwell Corp. v. Smith*, 107 Idaho 134, 139, 686 P.2d 79, 84 (Ct.App.1984) (scope of review on appeal is restricted to the specific grounds stated at trial by moving party for motion for directed verdict).

■ According to the Statute of Frauds set forth in I.C. § 9–505, "[a]n agreement that by its terms is not to be performed within a year from the making thereof" must be in writing in order to be enforceable. I.C. § 9–505(1). Section 9–505 does not govern oral contracts that "might have been fully performed and terminated[ ] within a year." *Darknell v. Coeur d'Alene & St. Joe Transp. Co.*, 18 Idaho 61, 69, 108 P. 536, 539 (1910); *Whitlock v. Haney Seed Co.*, 110 Idaho 347, 348, 715 P.2d 1017, 1018 (Ct.App.1986). "[E]ven if a contract appears on its face to anticipate performance for more than one year, it may fall outside the statute if it is subject to a condition or contingency that could occur within a year, terminating further performance." *Whitlock*, 110 Idaho at 348, 715 P.2d at 1018 (citing *Hubbard v. Ball*, 59 Idaho 78, 81 P.2d 73 (1938)).

The district court ruled that the Statute of Frauds did not govern the oral contract between GPC and General, wherein GPC allegedly promised that Frank Workland would be the exclusive NAPA jobber in Boise "as long as there was a Workland running General Auto." The district court explained:

> While such an agreement manifestly contemplates a long-term relationship extending over a period of years—if not generations—the agreement was capable of completion within one year. There were, at the time of the agreement, any number of reasons that a Workland would cease to run General within a one year period. Scenarios involving death, disability, disinterest, and financial problems all come readily to mind.

*Darknell v. Coeur d'Alene & St. Joe Transportation Co.*, 18 Idaho 61, 108 P. 536 (1910), involved an oral contract whereby a corporation agreed to employ the plaintiff at a specified salary so long as he continued to own and hold his stock in the corporation. This Court held that the contract was not barred by the Statute of Frauds because the contract was capable of being fully performed, completed and terminated within a year. *Id.* at 69–70, 108 P. at 538–39. The Court recognized that "the contract was to be terminated on the sale by plaintiff of his stock in the corporation" and that "[t]he sale [could] have taken place the following day or any day during the year." *Id.* at 70, 108 P. at 539.

GPC contends that the rule in *Darknell* is no longer controlling and was replaced by the holding in *Seder v. Grand Lodge, A.O.U.W. of North Dakota*, 35 Idaho 277, 206 P. 1052 (1922). The *Seder* court held that "a reservation of an option to cancel a contract by one or both of the parties does not of itself take the contract out of the statute." *Id.* at 281, 206 P. at 1053. *Seder* involved a contract, which by its very terms, could not be performed within a year. The defendant, Grand Lodge, orally promised to employ the plaintiff, Seder, and give him the exclusive right to solicit members within a specified district until the Grand Lodge held its next regular session. *Id.* at 280, 206 P. at 1053. The next regular session was scheduled to convene more than a year after the contract was made. *Id.* Based upon these facts, the oral contract fell within the Statute of Frauds. However, at the time the oral contract was made, Seder was also told that the

Grand Lodge "might" call a special meeting prior to the next regular session, and that if a special meeting was called, the Grand Lodge could terminate Seder's employment at that time. *Id.* at 281, 206 P. at 1053. The court in *Seder* considered this to be "a reservation of a right to cancel" and held that such an "option to cancel" did not take the contract out of the Statute of Frauds. *Id.*

*Seder* does not change the *Darknell* rule. The rule in *Seder* only applies to oral contracts which contain a definite term of more than one year. *See Frantz v. Parke,* 111 Idaho 1005, 1008, 729 P.2d 1068, 1071 (Ct. App.1986) (citing to *Seder,* the court recognized that "the mere possibility of cancellation within a year does not take a contract *with a definite term* outside the statute of frauds.") (emphasis added). Unlike the contract in *Seder,* the contract in the present case does not contain a definite term of duration.

The contract in this case is more like the contract at issue in *Whitlock v. Haney Seed Co.,* 110 Idaho 347, 715 P.2d 1017 (Ct.App. 1986). *Whitlock* involved an oral contract whereby the defendant promised to hire Whitlock to serve as a plant manager for Haney Seed Company as long as Whitlock performed satisfactorily and there was no change in plant ownership, no cessation of plant operations, and no expiration of the plant lease. *Id.* at 348, 715 P.2d at 1018. Recognizing that the contract did not specify "a discrete period of employment," the court in *Whitlock* concluded the contract was not governed by the Statute of Frauds because any one of the contingencies or extrinsic events—such as change in ownership, cessation of plant operations, or expiration of the plant lease—could have occurred within a year, thereby terminating further performance under the contract. *Id.* at 348–49, 715 P.2d at 1018–19.

Similarly, the contract in the present case was subject to several contingencies, all of which could have occurred within one year— *i.e.,* Frank Workland's death, disability, disinterest, or financial inability. The Statute of Frauds does not bar enforcement of the contract.

## C. There Is Sufficient Evidence That There Was A Meeting Of The Minds On The Material Terms Of The Contract.

GPC argued to the district court that the evidence reflected that the parties had not agreed on the material terms of duration, geographic scope or performance standards. Because there was no meeting of the minds on these material terms, GPC argued that there is no enforceable contract between the parties. GPC also claimed that the alleged terms of the contract were too indefinite to be enforceable. The district court disagreed and denied GPC's motion.

 The general rule is that a contract is enforceable if it is "complete, definite and certain in all its material terms, or contain[s] provisions which are capable in themselves of being reduced to certainty." *Giacobbi Square v. PEK Corp.,* 105 Idaho 346, 348, 670 P.2d 51, 53 (1983) (emphasis omitted). "[C]ourts will not hold the contracting parties to a standard of absolute certainty relative to every detail of a contract. Rather only reasonable certainty is necessary before a contract will be given legal effect." *Barnes v. Huck,* 97 Idaho 173, 178, 540 P.2d 1352, 1357 (1975) (footnote omitted). The parties' obligations must be identified so that the adequacy of performance can be ascertained. *See Dale's Serv. Co. v. Jones,* 96 Idaho 662, 665, 534 P.2d 1102, 1105 (1975), *overruled on other grounds by Peavey v. Pellandini,* 97 Idaho 655, 551 P.2d 610 (1976).

GPC relies on several out-of-state cases for its argument that, in order for contracts for exclusive distributorships to be enforceable, they must contain the material terms of duration, geographic scope and performance standards (*i.e.,* the level of performance a party must maintain in order to keep his exclusive right). For the cases relied on by GPC, see *Ryan v. Wersi Elecs. GmbH & Co.,* 3 F.3d 174, 180–81 (7th Cir.1993); *Industrial Equip. Co. v. Emerson Elec. Co.,* 554 F.2d 276, 288 (6th Cir.1977); *Video Cent., Inc. v. Data Translation, Inc.,* 925 F.Supp. 867, 869–70 (D.Mass.1996); *Marcraft Recreation Corp. v. Francis Devlin Co.,* 506 F.Supp. 1081, 1085 (S.D.N.Y.1981). There are no

858

Idaho cases which set forth such requirements.

■ The district court ruled that there was sufficient evidence to establish that there was a meeting of the minds on the material terms of duration and geographic scope. Specifically, the district court stated with regard to duration:

[V]iewing the evidence in a light most favorable to the plaintiff, one can conclude that there was a distinct understanding between the parties that as long as Frank Workland was in Boise operating the stores that he purchased from Genuine Parts Company, that that was the intended duration of the agreement.

I agree with the defense that other aspects, such as the assumption that when [Frank Workland's sons] went into the business, that the agreement would continue with them, is not sufficient. There's insufficient evidence to establish that distinct understanding.

But based on the testimony of Jim Workland, based on the documentary evidence presented by plaintiffs in this case which suggest a recognition on the part of GPC that such an agreement existed, I find that there is sufficient evidence to establish the meeting of the minds for a definite term of the duration of Frank Workland's involvement in the operation of the company stores.

There is evidence in the record to support the district court's determination. Jim Workland testified that, during negotiation of the oral contract in 1974, Fitzgerald told him: "As long as Frank's in Boise, Boise is his." Furthermore, in a September 1990 memo from Scott Carlson (a GPC employee) to his superiors, Carlson stated: "I understand completely that we cannot pursue another customer in Boise if Frank does not sell."

■ With regard to geographic scope, the district court concluded:

[A]gain, based on the testimony of Mr. Workland and, again, based on the inferences to be drawn from the documentary evidence, I find that there is sufficient evidence to establish a meeting of the

minds that the geographic scope was the Boise area.

I recognize the problem that ... has been well articulated by the defense, but I haven't seen anything in the way of case law that suggests that any sort of [metes] and bounds description is necessary to make a term of a contract sufficiently definite to pass muster, at least for the purposes of sending this to the jury.

This determination is also supported by the record. Although Frank Workland admitted that he and Fitzgerald never had a specific discussion about the geographic scope of the exclusive distributorship, James Workland testified that Fitzgerald told him that "[a]s long as Frank's in Boise, Boise is his." James Workland also testified that he specifically discussed geographic scope with Dennis Rigas (the previous manager of the Boise stores).

■ With respect to performance standards or sales quotas, however, there is insufficient evidence to establish that there was a meeting of the minds on these terms. James Workland conceded that there had been no discussions about performance standards. He testified that he only "assumed" as long as Frank Workland's business was successful, he would retain the exclusive rights. The district court, nevertheless, concluded that the fact that there was no meeting of the minds on performance standards did not make this particular contract unenforceable. The district court distinguished the present contract from the contract for an exclusive distributorship addressed in *Ryan v. Wersi Electronics GmbH & Co.*, 3 F.3d 174 (7th Cir.1993), a case relied on by GPC. Because the contract in *Ryan* did not contemplate sales quotas or durational terms, the court concluded that the contract lacked mutuality and, thus, was unenforceable. *Id.* at 181. Unlike the *Ryan* contract, the district court recognized that the contract in the present case "was part and parcel of the sale of the ... company stores, at least 80 percent interest by [GPC] ... to Mr. Workland." On this basis, the district court determined that there was an obligation of mutuality between the parties, making the contract enforceable despite the

fact that it did not specifically contemplate sales quotas. The district court also concluded:

> [S]imply because the parties did not explicitly or expressly discuss performance standards does not mean that the absence of discussion of that element means that the contract fails. I think that it was an implicit term between the parties that as long as Frank Workland was able to operate the businesses, that he met whatever implicit performance standards were involved with this case.

Assuming the sole rationale for requiring performance standards in exclusive distributorship agreements is to ensure an obligation of mutuality, such an obligation clearly exists under the circumstances of this case. "Mutuality of obligation as pertains to an executory contract requires that each party to the agreement be bound to perform; if it appears that one party was never bound on his part to do the acts which form the consideration for the promise of the other, there is a lack of mutuality of obligations, and the other party is not bound." *McCandless v. Schick,* 85 Idaho 509, 518, 380 P.2d 893, 898 (1963). The contract in this case was not an ordinary exclusive distributorship agreement like the one in *Ryan.* It was an agreement to sell a business, combined with an agreement of exclusivity. As the district court properly found, this agreement was supported by mutual consideration.

Even though there was no meeting of the minds on the issue of performance standards, there is sufficient evidence that there was a meeting of the minds on the material terms of the contract. Consequently, GPC's indefiniteness argument must fail. The district court's decision to deny GPC's motion for directed verdict on this basis is affirmed.

**D. There Is Sufficient Evidence To Allow A Jury To Conclude That GPC's Conduct Was The Cause Of General's Damages.**

■ "The general rule on damages for breach of contract is that they 'are not recoverable unless ... clearly ascertainable both in their nature and origin, and unless it is also so established that they are the natural

and proximate consequence of the breach and are not contingent or speculative.'" *Wing v. Hulet,* 106 Idaho 912, 918, 684 P.2d 314, 320 (Ct.App.1984) (quoting *Telluride Power Co. v. Williams,* 172 F.2d 673, 675 (10th Cir.1949)). Damages must be proven with reasonable certainty. *Id.* However, "[t]he law does not require rigid certainty ... [r]ather, it requires ... that the evidence be sufficient to support a reasonable inference of causation and to allow a jury reasonably to treat that inference as more probable than an inference connecting the loss to other causes unrelated to the defendant's conduct." *Id.* at 919, 684 P.2d at 321.

■ GPC contends that there are several factors which could have caused General's decline in sales, and that General has failed to prove with reasonable certainty that its changeover of Cal's was more likely the cause of General's decline in sales than the other factors. In ruling on GPC's motion for directed verdict, the district court noted that Frank Workland had testified that there were no other factors other than the changeover of Cal's which had an adverse effect on his business. However, as GPC points out, on cross-examination Frank Workland admitted that other factors could have affected General's decline in sales, for example: (1) customers could have decided to purchase from a different automotive business that was more conveniently located near them; (2) some customers' businesses declined generally, forcing them to reduce their purchases from General; and (3) if a customer underwent a change in ownership, the new owners may have preferred to purchase from different auto part suppliers instead of NAPA. GPC contends that the only acceptable evidence of causation in this case would be testimony from the customers that General had lost, explaining why they had reduced their business with General. Because General failed to present any such testimony, GPC argues that General failed to prove causation.

Contrary to GPC's position, there is sufficient evidence in the record to allow a jury to conclude that the inference linking GPC's conduct to General's damages is more probable than the inference connecting General's loss to the other factors identified. General's

economic expert, Dr. Frankle, testified that General's actual sales from 1992 through 1996 were significantly lower than what its sales should have been for that time period. GPC's changeover of Cal's took place in January 1991. Dr. Frankle also testified that, prior to 1991, General's actual sales were, for the most part, in line with its "expected" sales. It was not until 1991–92 when General's actual sales began to decrease significantly from its expected sales. Although Dr. Frankle was not allowed to testify that GPC's conduct actually caused General's decrease in sales, the district court believed Dr. Frankle's methodology was an acceptable approach, and ruled that his testimony was circumstantial evidence tending to corroborate Frank Workland's initial testimony that there were no other factors, other than the changeover of Cal's, which had an adverse effect on his business. General also presented evidence of the location of Cal's six stores, three of which are located only two miles from General's sole location.

A reasonable juror could conclude that the significant drop in NAPA sales after GPC changed six stores in the Boise area into NAPA dealerships was caused by the competition in the sale of NAPA parts rather than the factors suggested by GPC. The district court's denial of GPC's motion for directed verdict with respect to the issue of causation is affirmed.

## V.

## NEITHER PARTY IS ENTITLED TO AN AWARD OF ATTORNEY FEES ON APPEAL.

■ Both parties request an award of attorney fees on appeal pursuant to I.C. § 12–120(3). Section 12–120(3) provides for an award of attorney fees to the prevailing party in a civil action to recover in any commercial transaction. Section 12–120(3) defines "commercial transaction" to mean "all transactions except transactions for personal or household purposes." General initiated the underlying action to recover on an alleged contract whereby the parties agreed that General would have the exclusive right to be the only seller of NAPA auto parts in Boise. Consequently, the underlying action involves a commercial transaction contemplated in § 12–120(3).

General argues that because GPC's defense has consistently been that there was no contract for an exclusive right entered into between the parties, that GPC cannot rely on § 12–120(3) as support for an award of attorney fees on appeal. This Court has recognized that where an action is one to recover in a commercial transaction, that claim triggers the application of § 12–120(3) and the prevailing party may recover fees "regardless of the proof that the commercial transaction alleged did, in fact, occur." *Magic Lantern Prod., Inc. v. Dolsot,* 126 Idaho 805, 808, 892 P.2d 480, 483 (1995). *See also Atwood v. Western Constr., Inc.,* 129 Idaho 234, 240, 923 P.2d 479, 485 (Ct.App.1996) ("If a contract claim is of a type embraced within [I.C. § 12–120(3)], the proponent's failure to prove the existence of the alleged contract does not insulate that party from liability to pay the prevailing party's attorney fees.") Thus, because the underlying action was an action to recover in a commercial transaction, § 12–120(3) is triggered and the prevailing party on appeal is entitled to an award of attorney fees. *See Bott v. Idaho State Bldg. Auth.,* 122 Idaho 471, 481, 835 P.2d 1282, 1292 (1992) (an award of attorney fees to the prevailing party is appropriate under § 12–120(3) on appeal as well as at trial).

Because neither party prevailed on the issues they respectively raised on appeal, neither party is entitled to an award of attorney fees under § 12–120(3). *See Jeremiah v. Yanke Mach. Shop, Inc.,* 131 Idaho 242, 249, 953 P.2d 992, 999 (1998); *Powell v. Sellers,* 130 Idaho 122, 130, 937 P.2d 434, 442 (Ct. App.1997); *Baker v. Boren,* 129 Idaho 885, 897, 934 P.2d 951, 963 (Ct.App.1997).

## VI.

## CONCLUSION

The trial court's decisions to (1) deny General's motion to amend its complaint to include a claim for punitive damages, (2) limit General's measure of damages, and (3) deny GPC's motion for directed verdict on Gener-

al's breach of contract claim are affirmed. No attorney fees or costs are awarded.

Chief Justice TROUT, Justices WALTERS, KIDWELL and Justice Pro Tem. MONTE CARLSON, CONCUR.