# United States Court of Appeals
## For the First Circuit

No. 08-1048

NEW ENGLAND SURFACES, d/b/a DION DISTRIBUTORS, INC.,

Plaintiff, Appellant,

v.

E.I. DU PONT DE NEMOURS AND COMPANY, d/b/a DU PONT,
and PARKSITE, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before
Boudin, Selya and Dyk,[*]
Circuit Judges.

Paul F. Macri with whom William D. Robitzek and Berman & Simmons, P.A. were on brief for appellant.
Raymond Michael Ripple and John C. Wyman with whom Murtha Cullina LLP was on joint brief for appellees.

September 23, 2008

---

[*]Of the Federal Circuit, sitting by designation.

**BOUDIN**, **Circuit Judge**.    E.I. du Pont de Nemours and Company ("DuPont"), based in Delaware, is a well-known maker of chemical and other products.  In selling its solid surface materials, DuPont for a number of years franchised distributors, each with an exclusive marketing area or areas (referred to as the franchisee's "GMA").  One of these distributors--Maine based New England Surfaces ("NES")--held the exclusive franchise for much of New England.  The present appeal follows DuPont's termination of NES, NES' law suit against DuPont and the district court's dismissal of NES' claims.

NES, in various corporate incarnations, had for many years distributed DuPont solid surface materials.  Under its franchise agreements, NES purchased the raw DuPont materials and resold them, primarily to fabricators trained by NES, who made the final products--for example, countertops--and resold them to retailers or customers.  In the last full year before being terminated, NES sold more than $31 million of DuPont products, $27 million of which were of Corian, DuPont's leading (and highly profitable) solid surface countertop material.

In 2000, DuPont entered into new franchise agreements with NES covering three main surface product lines, to continue indefinitely until terminated by either side, which was allowed "with or without cause, upon at least thirty days prior written notice."  The agreements were to be "governed and construed in

-2-

accordance with the laws of the state of Delaware without giving effect to the conflict or choice of law provisions thereof." Although not stated in the agreements, DuPont expected that franchisees would not carry products that competed with the DuPont lines carried by the franchisees.

The relationship between the parties began to deteriorate in 2002. NES then held the franchises for Maine, Rhode Island and two northern counties in Connecticut. In 2002, at DuPont's urging NES acquired the struggling Connecticut-based company Kilstrom, which had the DuPont franchise as distributor for the remainder of Connecticut as well as Western Massachusetts. The purchase included Kilstrom's 70,000 square foot office and warehouse in Wallingford, Connecticut; fifteen NES employees thereafter worked primarily in Connecticut.

Following the purchase, NES began to have difficulty meeting DuPont-determined sales goals, which had been amended to include Kilstrom's quota. The change in performance may have owed something both to Kilstrom's condition and to the expiration of DuPont's patent protection on Corian, which led to Asian producers offering identical solid surface products at lower prices. It also appears that public tastes were shifting towards surfaces like granite that DuPont did not offer.

Other DuPont franchisees also encountered difficulties and, in early 2003, a group of nineteen DuPont distributors (self-

styled as the "G-19") joined together, aiming to present a "united front" in negotiations with DuPont. Three of these distributors (the "G-3") were selected to deal directly with DuPont, the chairman being George Pattee, the president of Parksite, Inc., a large DuPont franchisee based in Illinois. But the negotiations did not bear fruit and DuPont began to express dissatisfaction with the performance of NES and certain other franchisees.

By Fall 2003, NES had been placed on "critical review" by DuPont for failing to meet its revised sales goals. On December 5, 2003, DuPont required NES to create a "corrective action plan" for its performance difficulties and provide monthly-updated purchase forecasts. On February 11, 2004, Charles Trapani, who would later become president of NES, recommended (unsuccessfully) that NES begin to develop a relationship with DuPont competitors. In Trapani's words, NES was on a "slippery slope" with DuPont that was certain to end badly.

In April 2004, DuPont sent another warning to NES. By late 2004, DuPont's frustration with several distributors led it to explore a new approach to distribution, which DuPont called its "Route to Market Study." Parksite agreed to participate so that the distributor point-of-view could be presented, but did not initially disclose its role to its fellow G-19 members. Parksite quickly became aware that the project was targeted at certain

distributors and, fearing what would come next, initiated discussions with DuPont, hoping that DuPont would acquire it.

Although Parksite later revealed the study to other G-19 members, it kept its negotiations with DuPont secret. By mid-April 2005, DuPont was discussing terminating NES and replacing it with Parksite. Later that month, DuPont held meetings with NES, following up with a further critical letter to NES. Thereafter, Parksite refused to enter into a proposed G-19 agreement that distributor-members would agree not to accept any part of the GMA of a distributor terminated by DuPont without cause.

In October 2005, DuPont hosted a conference for fabricators, which NES also attended, and unveiled its "Cool Deal" promotion for 2006, which included substantial Corian price cuts for both distributors and fabricators. NES held its own fabricator conference in January 2006, looking toward the "Cool Deal" promotion. By then, DuPont had already told Parksite privately that NES would definitely be terminated. Nevertheless, in February 2006, DuPont invited all its distributors to participate in the "Cool Deal" promotion--subject to conditions.

To participate, each distributor was required to submit data about the retailers that the distributor was targeting for the promotion, including the name, address, telephone number and contact name for the retailer; and the amount of sales that the distributor had made of a particular product series in 2005. In

March, DuPont insisted that NES provide its complete customer list with sales figures, claiming that the data was needed to track results against the revised sales goals for distributors participating in the program.

One week later, Parksite and DuPont executed an agreement for Parksite to distribute Corian products in New England, providing that it would take effect upon the "termination by DuPont [of NES]." On April 4, 2006, at one p.m., DuPont notified NES that it would be terminated as an exclusive distributor in thirty days and be unable to distribute DuPont products at all thirty days after that. Four hours later, DuPont sent a fax to fabricators, retailers and builders in what had previously been NES' GMA, announcing that NES was being terminated.

The next day representatives from both DuPont and Parksite began visiting NES' customers, focusing attention on NES' largest customers. NES alleges that several of its customers were told that NES would be going out of business, although at the time NES had no such plans. Customers were also informed that if they wanted to ensure a continued supply of DuPont products they would need to contract with DuPont and not NES.

In the six months following NES' termination, Parksite and DuPont generated $15,440,789 worth of sales in NES' old region. NES also attempted to acquire competing surface products but, with a limited supply of customers and an inability to supply DuPont

products, quickly began a slide into collapse. In May 2006, NES sued DuPont and Parksite in federal district court in Maine based on diversity jurisdiction, seeking immediate injunctive relief to preserve its distributorship. The district court denied temporary relief and, in December 2006, NES went out of business and later sold its name and customer list to its former head for only $5,000.

Thereafter, in its pending district court lawsuit NES sought damages on numerous grounds; the theories of central importance on this appeal included (1) tort claims for fraudulent and negligent misrepresentation, breach of fiduciary duty and interference with contractual and prospective economic relations; (2) a statutory claim under the Connecticut Franchise Act, Conn. Gen. Stat. § 42-133l; and (3) breach of the covenant of good faith and fair dealing arising out of the franchise agreements.

The district court dismissed certain of NES' claims as a matter of law in October 2006 and after discovery granted defendants summary judgment on others in mid-September 2007. In late December 2007, the district court granted a renewed defense motion in limine to exclude NES' proffered damages witnesses. Based on this exclusion of evidence, the district court granted judgment for defendants on the remaining claims, as they had requested in the in limine motion, and this appeal followed.

On this appeal, NES first contests the district court's in limine exclusion of NES' proposed testimony on damages and its

consequent dismissal of NES' then-remaining claims.  These surviving claims stressed (first) DuPont's obtaining NES' customer lists (claiming fraudulent and negligent misrepresentation and breach of an implied covenant of good faith and fair dealing) and (second) defendants' contacts with NES' customers after the termination (claiming interference with contractual rights and prospective economic advantage).

The district court's predicate for dismissing these claims was the exclusion of NES' damages evidence, as set forth in pretrial submissions and deposition testimony.  That proposed evidence was to be offered through John Berry, NES' chief financial officer, whom NES designated an expert, and Robert Dion, NES' owner and chief executive officer.[1]  This testimony was configured to dovetail with NES' central contention that its termination by DuPont was wrongful, which was the thrust of a number of its original claims.

But those claims had already been dismissed when the district court granted the motion in limine.  By contrast, the remaining claims which had survived that initial dismissal and

---

[1]NES' damages expert John Berry estimated damages to NES as $6,347,000--the remaining nine months of profits that it had budgeted for sales of DuPont products in 2006.  In addition, NES pointed to DuPont's $15,440,789 in sales in the New England region following the termination as sales that otherwise would have been made by NES if defendants had not violated their duties to NES. This number was significant because it closely hewed to what NES had budgeted in sales for the year; NES argued that this was proof that its budgeted profits were reliable.

summary judgment asserted that Dupont and Parksite had by fraud and misrepresentation frustrated NES' sales of DuPont products during the sixty-day period (following notice but before termination became effective) and lessened NES' ability to provide customers competing products then or thereafter.  In dismissing the remaining claims, the district court explained:

> Evidence of lost profits and loss of the value of the company due to lost DuPont sales, while relevant to any claims of unlawful termination of the distribution agreements, is simply not relevant to the claims that remain in this case.

Although trial court decisions on the exclusion of evidence are sometimes said to be reviewed for abuse of discretion, e.g., United States v. Guerrier, 428 F.3d 76, 79 (1st Cir. 2005), the reality is that the standard depends on the rationale for the exclusion, which can be a matter of fact, law or logic.  Cameron v. Otto Bock Orthopedic Indus., Inc., 43 F.3d 14, 16 (1st Cir. 1994). Whether lost profits was a rational basis for damages for the claims made here may be closer to the law end of the spectrum,[2] but nevertheless we agree with the district court.

NES' projection of lost profits (based on the premise of a continued franchise) did not show what NES had lost through

---

[2]See, e.g., Lowe's Home Centers, Inc. v. General Elec. Co., 381 F.3d 1091, 1096 (11th Cir. 2004); Morley-Murphy Co. v. Zenith Electronics Corp., 142 F.3d 373, 381-82 (7th Cir. 1998); General Auto Parts Co., Inc. v. Genuine Parts Co., 979 P.2d 1207, 1212 (Idaho 1999); Szczepanik v. First S. Trust Co., 883 S.W.2d 648, 649-50 (Tex. 1994).

DuPont's allegedly wrongful obtaining of NES' customer lists or alleged misrepresentations to NES' former customers. Let us assume that NES, unhindered by fraud or falsehood, could have rebuilt its business with a new non-DuPont product. Even so, NES' projection of earnings as a DuPont distributor would not be a reliable indication of what its new post-termination business would have earned.

First, whatever substitute product NES might have procured would not have been labeled as DuPont Corian or assured a similar profit. Second, NES would at best have been competing with DuPont, itself selling Corian (at a newly reduced price) to New England customers who had long purchased it. Third, DuPont already had names of a number of those customers even if it did not know their sales volume and even if some fabricators had been purchasing Corian without their names having been registered with DuPont.

Maine courts, as elsewhere, allow prospective profits as damages only if they can be estimated with reasonable certainty. E.g., Eckenrode v. Heritage Mgmt. Corp., 480 A.2d 759, 765 (Me. 1984). Neither NES' pre-termination projections as a DuPont distributor nor DuPont's actual post-termination sales shows what NES was likely to earn selling a substitute product in competition with DuPont. In all likelihood, NES' damage calculations were not prepared to cover the contingency that its wrongful termination claims might fall short of trial.

NES argues that DuPont's misrepresentations began when it led NES to think it would participate in the "Cool Deal" promotion; and (NES argues) had it known in late 2005 that it was on its own, an alternative source of supply could have been procured before DuPont terminated NES. Even if so, projected Corian profits were not a plausible forecast of NES' profits competing with DuPont. Nor would DuPont likely have given NES more than thirty or sixty days to develop a new supply source had termination occurred at an earlier time.

NES also contends that were it not for DuPont's tortious acts, NES would have retained the exclusive use of its customer data, implying that DuPont would not have been able to compete effectively with NES. But DuPont already was in possession of some (although not all) of the customer names. And NES customers unknown to DuPont would have had good reason to seek DuPont out once NES was terminated. NES does not argue that, absent the name and volume information it acquired, DuPont would not have dared to terminate NES at all.

Any such misrepresentations would likely have caused some injury by diverting some sales during the sixty days when NES could still sell DuPont products. Or, NES might have tried to assign a value to the customer list information before providing it to DuPont. Courts are fairly generous in allowing reasonable estimates as to damages, especially where intentional torts have

-11-

occurred.  See Restatement (Second) Torts, § 435B cmt. a (1965).
But no rational estimate on either theory was proffered.

Two related contentions by NES deserve brief mention:
first, that even assuming the motion in limine was properly
granted, the district court had no business moving from there to a
dismissal of the remaining claims because no summary judgment
motion or motion to dismiss was pending; and, second, that
exclusion of the damage testimony does not justify dismissal
because "lost profits would be only one method by which NES could
prove damage."

This might be a different case if NES had met the
dismissal with a claim of surprise, a motion for reconsideration
and a proffer as to how it expected to prove damages on the
remaining claims without the excluded testimony.  It made no such
motion.  Even now it does not explain what other evidence it had to
show specific dollar damages, short of the conclusory accusation
that DuPont's actions caused it to lose "goodwill."

Further, defendants' in limine motion did say that if the
motion were granted, NES' remaining claims would fail for lack of
any proof of damages, and then asked the district court to enter
judgment for the defendants.  This request for judgment effectively
reiterated the defendants' request for summary judgment on these
claims.  NES thus had an obligation to respond to this motion by
presenting any available evidence, such as non-expert testimony it

planned to offer, that would support denial of the request for judgment.

NES argues that its customer lists could be treated as misappropriated assets and that DuPont had independently budgeted to purchase them. But there is no indication as to a specific amount budgeted by DuPont, nor any proposed testimony by an NES witness offering an expert valuation. NES says it was not required to produce such information in advance of trial which, if expert testimony is at issue, is wrong. See Fed. R. Civ. P. 26(a)(2)(A). In all events, NES should have told the district judge of this fall-back theory.

Finally, NES makes two related arguments based on its asserted potential to receive nominal damages for the alleged wrongs committed by defendants. Initially, it claims that the district court recognized that it was entitled to nominal damages, and therefore it had the right to claim those damages at trial. Then, it says that had it been awarded nominal damages, it would also have been entitled to secure meaningful punitive damages.

Under Maine law, which the court applied to the remaining claims, nominal damages may be awarded without proof of actual loss in only two categories of tort cases neither of which are at issue here, Horton & McGehee, Maine Civil Remedies § 15-2(d)(2), 331 (3d ed. 1996); see also Vallely v. Scott, 138 A. 311 (1927) (stating actual loss requirement). And, contrary to NES' argument, in Maine

punitive damages are not available where only nominal damages are awarded.  Stacy v. Portland Publ'g. Co., 68 Me. 279 (Me. 1878); see also Hall v. Edwards, 23 A.2d 889, 890 (Me. 1942) (noting rule in Maine).[3]

On this appeal, NES has abandoned most of its claims based on wrongful termination but it does rely on one closely related claim, namely, a count asserting DuPont's liability under the Connecticut Franchise Act.  This statute protects franchisees against termination without cause, even where the franchise agreement allows termination in any circumstance, but applies "only to franchise agreements . . . the performance of which contemplates or requires the franchisee to establish or maintain a place of business in [Connecticut]."  Conn. Gen. Stat. § 42-133h.

If the statute applies, it overrides the termination without cause provision in DuPont's franchise agreements, Conn. Gen. Stat. § 42-133f(f) ("Any waiver [of the statute's rights] which is contained in any franchise agreement . . . shall be void."); but the district court ruled on summary judgment that the agreements did not require NES to maintain a place of business in

---

[3]Because the claim based on a fair dealing covenant sounds in contract, arguably Delaware law governed (as the parties had agreed for contract claims) and, under Delaware law, arguably punitive damages are allowed based on nominal damages. See Marcus v. Funk, No. 87C-SE-26-1-CV, 1993 WL 141864, at *1 (Del. Super. Apr. 21, 1993) (citing Restatement (Second) of Torts § 908 cmt. c (1979)). However, NES did not raise this argument either on motion for reconsideration, its briefs in this court, or at oral argument.

-14-

Connecticut and that, whatever NES may have intended when it bought Kilstrom, it was mere conjecture that DuPont had any belief as to whether NES would maintain a Connecticut place of business.

Review on a grant of summary judgment is de novo both as to pure legal issues and as to whether the evidence created a material issue of fact requiring a trial. McGuire v. Reilly, 386 F.3d 45, 56 (1st Cir. 2004). A threshold question is what the statute means by saying that the "performance" of a franchise agreement "contemplates" a place of business in Connecticut. The district court read this language to require that DuPont, as well as NES, have a subjective expectation of an NES presence in Connecticut.

It well might be enough if a reasonable party in DuPont's position would foresee that NES would likely maintain Kilstrom's existing place of business. The statute does not say that the "parties" must both share a subjective intent and its main purpose is to protect "Connecticut" franchisees, see H.R. Proc., 1972 Sess., p. 2777 (Statement of Rep. Webber). The statute's place of business language also makes clear that a franchisee can qualify-- at least to the extent of its Connecticut operations--wherever its headquarters. We could find no direct precedent, although case law from other jurisdictions suggests that the place of business

requirements in such statutes are generously construed in favor of the franchisee.[4]

However, the difference between objective and subjective intent may not matter here because what a reasonable person would expect is relevant evidence of what DuPont did expect. And on the present record (what the evidence at trial might show is a different matter) a jury could believe two things: that DuPont "knew" through those involved in its dealings with NES that Kilstrom had a substantial physical footprint in Connecticut and that--for NES to service customers in Connecticut far from its Maine facility-- such a presence might well be maintained.

Kilstrom was DuPont's principal distributor in Connecticut and DuPont could hardly be ignorant of how it operated. In addition, DuPont added the former Kilstrom sales quota to that of NES, informally promising NES promotional support. Absent other facts, a jury could reasonably conclude that DuPont expected, whether or not it cared, that to justify the Kilstrom purchase and to meet its revised sales goals, NES would carry on Kilstrom's place-of-business presence in Connecticut, thus triggering the statute.

---

[4]Dr. Pepper Bottling Co. of Paragould v. Frantz, 842 S.W.2d 37, 40 (Ark. 1992) (statute did not require agreement to refer to a fixed location in state); Crone v. Richmond Newspapers, Inc., 384 S.E.2d 77, 80-81 (Va. 1989) (statute requires merely that "the business transacted" have a "nexus" to Virginia).

DuPont says that the statute was not meant to apply to out of state businesses like NES. But the legislative history it cites says only that an out of state <u>franchisee</u> is not protected merely because the franchisor is a Connecticut company, which is another matter entirely. 28 S. Proc., Pt. 10, 1972 Sess., p.3240-41 (remarks of Sen. Kevin Johnston). This hardly suggests that an out of state franchisee is unprotected where it maintains a Connecticut place of business, at least to the extent of its in-state franchise.

The question remains whether the statute <u>can</u> apply, given that the franchise agreements provide that they are to be governed by Delaware law. DuPont argues that the district court said no, giving rise to an alternative ground which NES cannot challenge because it did not brief the issue. By our reading, the district court rested on the lack of a contemplated Connecticut base, mentioning the choice of law provision only to indicate that the parties never contemplated that NES would maintain a place of business in Connecticut.

Indeed, DuPont merely cites the choice of law provision as the district court's alternative ground without seriously briefing it, but presumably DuPont could renew the Delaware law argument if we merely remanded; this is primarily an issue of law, but it may not be an easy question. Nor do we think it is resolved in DuPont's favor by <u>Northeast Data Systems, Inc.</u> v. <u>McDonnell</u>

-17-

<u>Douglas Computer Systems Co.</u>, 986 F.2d 67 (1st Cir. 1993), which was concerned only with a chapter 93A claim under Massachusetts law, which (critically) contains no anti-waiver provision.

Because the district court's jurisdiction is based on diversity, the question in part is what a Maine state court would do with the choice of law provision. <u>Klaxon Co.</u> v. <u>Stentor Elec. Mfg. Co. Inc.</u>, 313 U.S. 487, 496 (1941). Maine, in deciding a comparable issue, <u>Baybutt Constr. Corp.</u> v. <u>Commercial Union Ins. Co.</u>, 455 A.2d 914, 918 (Me. 1983), relied on the test set forth in the <u>Restatement (Second) of Conflict of Laws</u> § 187 (1971), to resolve such problems--a test whose application to the present problem has divided other courts.[5]

Under the Restatement test, a forum selection clause can abrogate state law that would otherwise apply in two situations. The first is when "the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." <u>Restatement (Second) Conflict of Laws</u> § 187(1) (1971). However, the Connecticut statute voids any waiver of its protection, Conn. Gen. Stat. § 42-133f(f), and under state

---

[5]<u>Compare</u> <u>Tele-Save</u> <u>Merchandising Co.</u> v. <u>Consumers Distributing Co., Ltd.</u>, 814 F.2d 1120 (6th Cir. 1987) (choice of law provision applying law of New Jersey precluded application of Ohio Business Opportunity Plans Act even though Ohio Act had explicit no-waiver provision) <u>with</u> <u>Modern Computer Sys., Inc.</u> v. <u>Modern Banking Sys., Inc.</u>, 858 F.2d 1339, 1342-45 (8th Cir. 1988) (agreement to apply Nebraska law to franchise agreement would not abrogate franchisee's right to protection under Minnesota Franchise Act).

precedent this provision is construed to apply to choice of law clauses. Pepe v. GNC Franchising, Inc., 750 A.2d 1167, 1168 (Conn. Super. Ct. 2000).

Alternatively, a forum selection clause may be given effect unless

> application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement, supra, § 187(2)(b). Connecticut's Franchise Act is a fundamental state policy within the meaning of the Restatement, as a directly pertinent comment makes clear.[6] How to apply the balancing test is perhaps a closer question.

Let us assume for argument's sake that Delaware's would be "the applicable law in the absence of an effective choice of law by the parties": does Delaware have "a materially greater interest" than Connecticut in whether NES may be terminated without cause? Connecticut has an affirmative policy of protecting local franchisees from termination at will; it is far from clear that

---

[6]Restatement, supra, § 187 cmt. g ("[A] fundamental policy may be embodied in a statute ... which is designed to protect a person against the oppressive use of superior bargaining power."); see also Grand Light & Supply Co., Inc. v. Honeywell, Inc., 771 F.2d 672, 677-78 (2d Cir. 1985) (purpose of Connecticut Franchise Act to "prevent a franchisor from taking unfair advantage of the relative economic weakness of the franchisee").

Delaware has any policy against such protection of franchisees merely because the franchisor is incorporated in Delaware.

The only precedent we could find ourselves appears to support NES. See Carlos v. Philips Bus. Sys., 556 F. Supp. 769, 774 n. 4 (E.D.N.Y. 1983), aff'd 742 F.2d 1432 (2d Cir. 1983), but the issue has not been briefed by either side in this court, and we are reluctant to carry the discussion further. The ground on which the district court decided the issue is not persuasive to us; and the alternative ground invoked (but not developed) by DuPont is not so clearly conclusive as to make a remand pointless.

NES' remaining arguments as to claims not yet discussed are readily answered. First, it says that the franchise agreements were unconscionable insofar as they limited DuPont's liability for termination of the agreement or for communications with prospective customers incident to such a termination. One of the counts of the complaint charged unconscionability, but the district judge dismissed the claim pursuant to defendants' motion to dismiss, saying that the controlling provision--allowing termination by either side on thirty days notice--was reciprocal and not unfair.

Unconscionability is ordinarily a defense to a claimed breach of contract, 8 R. Lord, Williston on Contracts § 18:1 (4th ed. 2006), but NES may mean that the termination clause is invalid, thereby leaving it with a contractual right to its franchise. Yet insofar as the focus is on the right to terminate on thirty days

-20-

notice, Delaware law rejects the defense unless the terms are "so one-sided as to be oppressive" or there is "no reasonable relation to the business risks involved." Tulowitzki v. Atlantic Richfield Co., 396 A.2d 956, 960 (Del. 1978). A reciprocal right to terminate, as between competent businesses, is neither one-sided nor oppressive nor lacking in business purpose.

The provision immunizing communications with customers possibly could be read so broadly as to raise unconscionablility problems (for example, by immunizing dishonest statements about NES); but the district court did not rely on it in rejecting the tort claims relating to communications with NES customers, and it was irrelevant to the outcome. The fatal flaw there was the lack of specific damages tailored to the supposed wrong.

Second, NES contests the district judge's initial grant of summary judgment on one other claim: that Parksite breached a fiduciary duty owed to NES. NES argues that Pattee's role as the lead representative of the G-3 created a fiduciary duty owed to the remaining members of the G-19, including NES; and it says that Pattee breached this duty by using his role to steer the Route to Market study in its favor and then by failing to inform NES that DuPont planned to terminate it.

The district judge held that there was no fiduciary relationship between Parksite and NES, but there is a shorter route to the same end. Whatever duty Pattee may have had to the G-19

-21-

group with respect to any negotiations on behalf of the group, his firm--like NES--remained independent in its distributor relationship with DuPont. In fact, Parksite refused to sign an agreement, circulated among G-19 members, whereby each member would have pledged not to accept any part of the GMA of a distributor terminated by DuPont without cause.

So, if there was some fiduciary responsibility, which is perhaps doubtful, it was narrowly focused and the conduct complained of was not within its scope. The Route to Market study was not a project of the G-19, nor is there any claim that Parksite obtained information in its capacity as a G-3 member that it used to its advantage. Limited cooperation among business rivals does not imply any general duty to look after each other's interests beyond the joint undertaking.

The judgment of the district court is <u>affirmed</u>, save for NES' claim based on the Connecticut Franchise Act. The judgment as to that claim is <u>vacated</u> and the case is <u>remanded</u> for further proceedings consistent with this decision. With the case thus narrowed, the parties ought to consider the possibility of settlement in lieu of further costly litigation. Each party shall bear its own costs on this appeal.

<u>It is so ordered</u>.